Robert SMITH, Commissioner, Department of Health and Social Services; Roger Endell, Director, Division of Adult Corrections, Department of Health and Social Services; Vernon Caulkins, Assistant Director, Division of Adult Corrections, Department of Health and Social Services; Reverend William Lyons, Beverly Dunham, Frederick Pettyjohn, Al Widmark, and Conrad Miller, all of the Alaska Parole Board; Samuel Trivette, Executive Director of the Alaska Board of Parole, and their subordinates, employees, and agents, Appellants and Cross–Appellees,

v.

Michael CLEARY, Demetry Kenezuroff, Harry Morgan, Bob Owen, Thomas Walter, and Ernest Morgan, on behalf of themselves and all other persons who are now or will be similarly situated, Appellees and Cross–Appellants.

Nos. S–7810, S–7850.

Supreme Court of Alaska.

June 22, 2001.

John K. Bodick, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellants/Cross–Appellees.

R. Scott Taylor and Phillip R. Volland, Rice, Volland & Taylor, P.C., Anchorage, for Appellees/Cross–Appellants.

Before MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. *INTRODUCTION*

The state and a group of state prisoners entered into an elaborate agreement to settle a class action challenging conditions in Alaska prisons. To alleviate overcrowding prohibited by the agreement, the state proposed to transfer a large group of prisoners to a private prison in Arizona. Alaska prisoners asked the superior court to enjoin the transfer. The court denied the injunction and approved the transfer, but required the Arizona facility to comply with the settlement agreement's provisions. On appeal, the state challenges this requirement, arguing that the agreement does not cover private prison facilities. But the plan to transfer prisoners was designed to achieve compliance with the settlement agreement's overcrowding provisions and so, under the agreement's express terms, required court approval. Because the superior court did not exceed its approval authority by requiring the Arizona facility to comply with the agreement, we affirm.[1]

## II. *FACTS AND PROCEEDINGS*

This case began in 1981 as a class action brought against the state by Alaska prisoners challenging prison conditions. The plaintiffs formed three subclasses: pretrial detainees (subclass A), sentenced prisoners in state owned or operated correctional centers (subclass B), and prisoners held by the state in federal facilities (subclass C). Although the state and subclass C settled in 1983, litigation continued with the remaining subclasses until the parties entered a comprehensive settlement, which the superior court incorporated in a consent decree in 1990.

---

1. On cross-appeal, the prisoners claim that the court erred in denying an injunction. But we decline to reach this issue, because it is moot.

The settlement agreement applied to "all inmates, with some exceptions, who are or will in the future be incarcerated in correctional facilities owned or operated by the state" and bound the Department of Corrections and "any successor department, division, or agency of the state of Alaska which is statutorily responsible for the administration of the state's adult correctional facilities." It included elaborate provisions for future operation of Alaska prisons, enumerated rights of inmates, guaranteed the availability of specific rehabilitative programs and services, required the state to implement an inmate classification system, created population guidelines, and established caps to eliminate overcrowding. The agreement also established mechanisms to monitor ongoing compliance, including a provision calling for a designated superior court judge to have continuing jurisdiction over alleged violations. The questions before us relate to that continuing jurisdiction.

After the parties entered into the settlement agreement, Alaska prison populations began to consistently exceed allowable limits. The superior court held the state in contempt and ordered it to pay sanctions for each day that prison populations exceeded the guidelines set forth in the settlement agreement. The court further ordered the state to submit monthly population reports as long as it remained in non-compliance. In response, the state entered a sole-source contract with Corrections Corporation of America to house Alaska prisoners at the Central Arizona Detention Center, a private correctional facility it operated in Arizona. The contract contained confinement conditions modeled on American Correctional Association standards but did not expressly incorporate the rights and benefits secured by the settlement agreement.

Michael Cleary and other state prisoners (collectively, Cleary), acting on behalf of all similarly situated prisoners, challenged the proposed transfers to Arizona and moved for preliminary and permanent injunctions, arguing that the state's plan would violate the agreement, was contrary to state law, would impede their access to the court, and would infringe various constitutional rights of Alaska prisoners. In January 1995 the superior court denied Cleary's motion for a preliminary injunction. By February the state had selected 206 prisoners for transfer and moved them to Arizona.

After allowing extensive discovery and holding evidentiary hearings, the superior court denied Cleary's motion for a permanent injunction, concluding that the classification criteria used to select prisoners for transfer to Arizona satisfied the requirements of equal protection and procedural due process. But because it found that the state's contract with Corrections Corporation of America omitted important aspects of the settlement agreement,[2] the court conditioned its approval of the transfer on the Arizona facility's compliance with the terms of the agreement.

The state appeals from the portion of the court's order that requires the Arizona prison to comply with the settlement agreement. Cleary cross-appeals the superior court's order declining to enjoin the transfer of state prisoners to Arizona.

## III. DISCUSSION

### A. Standard of Review

■ The settlement agreement's scope and effect raise questions of contract law that we review de novo.[3]

### B. Issues on Appeal

The state contends that the settlement agreement does not extend to privately operated contract facilities. According to the

---

**2.** Specifically, the superior court found that the state's contract to hold prisoners in Arizona omitted most of the settlement agreement's provisions concerning operations and facilities, failed to provide required vocational and rehabilitative programs, and neglected to ensure procedural rights in classification, administrative segregation, discipline, and grievances as set forth in the agreement.

**3.** See Hertz v. State, Dep't of Corrections, 869 P.2d 154, 154 (Alaska 1994); Logghe v. Jasmer, 686 P.2d 694, 697 (Alaska 1984) (indicating that consent decrees are construed following normal principles of contract interpretation).

state, an order previously entered by the superior court in this litigation resolved this point. In 1986 the superior court denied a motion by the state prisoners housed in federal facilities—members of subclass C in the pending class action—to enjoin the state from transferring prisoners to a state—run facility in Minnesota. The superior court ruled that conditions at the Minnesota prison were beyond the scope of the class action and thus did not violate prisoners' rights under subclass C's partial settlement agreement. The state insists that this ruling is now the law of the case and so precludes the court from requiring the Arizona facility to comply with the terms of the settlement agreement. The state independently contends that the agreement cannot properly be extended to the privately operated Arizona prison, because the agreement's express terms limit its application to conditions in prison facilities owned or directly operated by the state.

Cleary responds that the 1986 ruling is not determinative. According to Cleary, inmates held in Arizona are parties to the settlement agreement and, as such, are entitled to its protections. Moreover, because the settlement agreement expressly required court approval of the state's plan to alleviate overcrowding by transferring prisoners to Arizona, Cleary reasons that the agreement gave the court power·to order compliance with the agreement as a condition of approving the proposed transfer.

1. *The law of the case did not preclude the court from ordering the Arizona facility to comply with the settlement agreement.*

■ In advancing its law-of-the-case theory, the state focuses on the broad phrasing of the superior court's 1986 order, which, according to the state, established that "issues regarding the housing of prisoners in correctional facilities located in other states that are not owned or operated by the State of Alaska or the [Federal Bureau of Prisons] are not included in the claims brought by Subclasses A, B or C and are thus not properly before the court in this case." According to the state, "[t]his is the law of the case which the trial court was required to follow."

■ The doctrine of the law of the case is a matter of judicial policy[4] and describes "the practice of courts generally to refuse to reopen what has been decided,"[5] but does not limit their power to do so.[6] Moreover, the policy against reconsidering issues adjudicated in a prior appeal[7] or issues "directly involved with or 'necessarily inhering'" in a prior decision applies only if there has been "a final judgment ... with respect to the issues at hand."[8]

In the prior litigation at issue here, Alaska prisoners housed in federal prisons moved to prevent transfer of prisoners to a state-run facility in Minnesota on grounds that transfer would violate an agreement governing the treatment of subclass C members. The superior court denied the motion because it determined that prisoners transferred to Minnesota would not be members of subclass C, and that prison conditions in that state therefore could not be challenged by subclass C members.[9] The 1986 order thus turned on subclass C members' standing and the fact that membership in that subclass was limited to state prisoners held in federal facilities. It did not define the membership of subclass

4. See *Stepanov v. Gavrilovich*, 594 P.2d 30, 36 (Alaska 1979); see also *West v. Buchanan*, 981 P.2d 1065, 1067 (Alaska 1999); *Price v. S.S. Fuller, Inc.*, 639 P.2d 1003, 1008 n. 12 (Alaska 1982).

5. *West*, 981 P.2d at 1067 (quoting *Stepanov*, 594 P.2d at 36).

6. See *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1228–29 (Alaska 1992).

7. See *Dewey v. Dewey*, 969 P.2d 1154, 1159 (Alaska 1999); see also *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977).

8. *Wolff*, 560 P.2d at 763 (citations omitted).

9. According to the 1986 order, "Alaskan prisoners attempting to challenge herein their transfer to the Minnesota state-operated facilities are not members of Subclass C." The 1986 order stated that reading the Subclass C Settlement Agreement as including prisoners transferred to out-of-state facilities not operated by the Federal Bureau of Prisons would require reformation of the agreement, which the court declined to do.

B—sentenced state prisoners held in state facilities, the prisoners who are currently before the court—and did not speak to the question of whether locally held prisoners transferred to a private Arizona facility continue to be state prisoners under the terms of the settlement agreement now at issue. Accordingly, the 1986 order did not amount to the law of the case controlling the superior court's decision in the present controversy.

2. *The settlement agreement does not directly apply to conditions at the privately operated Arizona facility.*

■ The state and Cleary both correctly observe that the legal effect of the settlement agreement is a question of contract law that this court decides independently.[10] Our decision is guided by the goals expressed in *Municipality of Anchorage v. Gentile:*

> The goal of the court is to enforce the reasonable expectations of the parties. In determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made. The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.[11]

As one might expect, the state and Cleary claim to have had different intents and expectations when the contract was made.

The parties agree that the settlement agreement does not mention private contract facilities, which were prohibited by law when the parties agreed to the settlement.[12] The agreement defines the state's obligations as extending only to inmates who are "incarcerated in correctional facilities owned or operated by the state." Because the Arizona facility is neither owned nor operated by the state, it is not directly regulated by the agreement. Cleary argues that the agreement's drafters did not contemplate private

contract facilities; but this argument only supports our conclusion that the parties did not expect their agreement to cover these facilities.

Construing the settlement agreement to govern private contract facilities would thus require reformation, which Cleary has not requested. Though the agreement itself provides for some forward-looking flexibility in applying its terms, these provisions do not support such a sweeping redefinition of its scope. For example, Section IX.B.2 states that the agreement "shall be considered a final judgment of a prospective nature which is binding upon the Department." Section IX.B.4 specifies that "a clear showing of material changes in circumstance . . . may give rise to a request by either party that it be relieved from judgment, and that all or some provisions of this agreement be vacated and/or modified accordingly." And Section IX.B.4(d) provides that "future questions regarding the implementation and enforcement of this agreement shall be interpreted in a manner that gives meaning to the intent expressed by the parties with consideration for changes to Alaska's adult correctional facilities that may exist at the time." Yet none of these flexibility provisions could reasonably justify reading the agreement as directly regulating a category of facilities—and a class of inmates—never addressed or contemplated by the contracting parties.[13]

Because the settlement agreement only regulates conditions in correctional facilities owned or operated by the state, then, we hold that it does not directly cover Alaska inmates incarcerated at the Central Arizona Detention Center.

3. *The superior court properly required compliance with the settlement agreement as a condition of approving the state's plan to reduce overcrowding in Alaska prisons.*

■ Cleary argues that even if the settlement agreement does not directly apply to

---

10. *See supra* note 3.

11. 922 P.2d 248, 255–56 (Alaska 1996) (citations omitted).

12. *See* Former AS 33.30.031 (1990) (prohibiting the use of private contract prison facilities).

13. In this respect, we agree with the reasoning of the 1986 order which declined to read the subclass C settlement agreement as having broad application to out-of-state facilities other than those operated by the Federal Bureau of Prisons.

conditions at the Arizona facility, it empowered the superior court to require compliance as a condition of approving the state's plan to reduce overcrowding.

The settlement agreement sets forth population control measures that remain in effect until emergency overcrowding legislation is enacted.[14] Section VIII.E of the agreement obliges the state to limit overcrowding and requires it to submit mitigation plans for court approval if overcrowding becomes chronic; when the state seeks court approval, prisoners may object to the plan and "seek such other relief ... as they deem appropriate." Section IX additionally provides for future monitoring, modification, and enforcement of the agreement and broadly authorizes the superior court to "give[ ] meaning to the intent expressed by the parties with consideration for changes to Alaska's adult correctional facilities that may exist at the time."

After the parties entered their settlement agreement, Alaska prisons became chronically overcrowded; when the state failed to remedy the problem, the superior court declared the state to be in contempt of the consent decree for failing to present a plan to reduce overcrowding below the settlement agreement's emergency caps. In response, the state developed its plan to house prisoners on a contract basis in the Corrections Corporation of America's Arizona facility. The original transfer involved more than two hundred inmates; thereafter, the Arizona facility continued to play an integral role in the state's efforts to control overcrowding in Alaska, and hundreds of additional inmates were transferred to Arizona. Indeed, corrections officials who testified before the superior court expressly acknowledged that the department had found no other effective solution for overcrowding. The record thus amply supports the superior court's decision to treat the Arizona transfers as the state's

plan for reducing overcrowding under the agreement.

The state does not seriously dispute the court's decision to treat the contractual arrangement for housing prisoners in Arizona as the state's plan to mitigate overcrowding under Section VIII.E.7 of the settlement agreement, which specifically required court approval.[15] But the state nonetheless insists that the scope of the court's approval authority is quite narrow. Because Section VIII.E.7 deals exclusively with overcrowding, the state reasons, its grant of approval authority "should also be limited to whether the plan is likely to produce the intended result of reducing prisoner populations."

But the state's proposed reading of Section VIII.E.7 is unreasonably narrow, for it would reduce the court's power of approval to a simple process of counting heads. By so doing, it would render meaningless the provision's express language allowing prisoners to object to the plan and seek other appropriate relief, which necessarily implies the settlement agreement's intent to grant the court considerable discretion in exercising its approval authority. Here, because the state's mitigation plan would inevitably have long-range effects on a large number of inmates who were or would be covered by the settlement agreement, and because the plan's primary purpose was to fulfill the state's obligations under the agreement itself, the superior court did not abuse its discretion by making its approval contingent on the state's continued compliance with agreement in the Arizona prison, even though the agreement did not directly extend to privately operated facilities.

This is not to say that the superior court was bound to order compliance with the agreement in Arizona, or even that its understandable desire to ensure substantial compliance compelled it to order literal compliance with all of the agreement's original requirements. In holding that the superior

---

14. The parties acknowledge that because legislation as described in Section VIII.A and VIII.B has not been enacted, Section VIII.E remains in effect.

15. Section VIII.E.7 of the settlement agreement expressly requires the state, in the event of

chronic overcrowding, to "present for approval a plan which provides for the reduction of the inmate population to below maximum capacity in each of the Department's facilities within 30 days, and a plan which will maintain the population level at or below maximum capacity."

court did not abuse its discretion, we emphasize that the forward-looking flexibility provisions of the settlement agreement, discussed above, make it clear that the superior court had broad discretion to tailor its application of the settlement agreement to the particular needs and circumstances that the prisoners, the correctional staff, and the state would face upon transfer of prisoners to the privately operated Arizona facility.

To the extent that the state argues here that application of the settlement agreement to the Arizona facility is burdensome in uncontemplated ways, and to the extent that the superior court may not have fully considered the possibility of tailoring the agreement to the particular conditions in Arizona, the state may request appropriate modifications upon return of this case to the superior court, and the court will have discretion to consider any such requests in the exercise of its continuing supervisory authority.

As matters currently stand, however, because the superior court had discretion to require compliance with the settlement agreement at the Arizona facility and because the state has failed to demonstrate an abuse of that discretion here, we affirm the court's ruling.

## C. *Issue on Cross–Appeal*

■ On cross-appeal, Cleary contends that the superior court erred in deciding that the process used to classify prisoners for transportation to Arizona was constitutional. The state responds that question is moot. We agree.

Cleary does not dispute that this issue arose in the context of an unsuccessful request for injunctive relief. Because the superior court denied an injunction, the prisoners originally affected by the transfer decision have already been moved to Arizona. Moreover, it appears that the disputed classification procedures used by the state for the first wave of transfers are no longer in effect. The question presented by Cleary on cross-appeal, then, is functionally moot.

■ Although we generally decline to decide moot questions,[16] we sometimes apply an exception when deciding a moot question would be in the public interest.[17] To determine whether this exception applies, we consider the importance of the issue and assess the likelihood that it might arise again but repeatedly evade review.[18] These criteria counsel against applying the exception here.[19]

The general type of challenge raised by Cleary is certainly capable of repetition. But the particular classification procedures challenged in a future case would likely differ significantly from the procedures disputed in the present case. Public policy therefore does not strongly favor resolving the issues addressed in the briefing and record before us. Moreover, the settlement agreement ordinarily allows compliance challenges to be prosecuted individually by prisoners who have exhausted all available administrative remedies.[20] A record produced in an individual case brought after proper exhaustion of administrative remedies would lend itself more readily to proper application of the

**16.** *See generally Witt v. Watkins,* 579 P.2d 1065, 1071 n. 19 (Alaska 1978); *Etheredge v. Bradley,* 502 P.2d 146, 153 (Alaska 1972).

**17.** *See O'Callaghan v. Rue,* 996 P.2d 88, 94 (Alaska 2000); *Legislative Council v. Knowles,* 988 P.2d 604, 606 (Alaska 1999); *Krohn v. State, Dep't of Fish & Game,* 938 P.2d 1019, 1021 (Alaska 1997); *Tulkisarmute Native Community Council v. Heinze,* 898 P.2d 935, 940 n. 7 (Alaska 1995).

**18.** *See Legislative Council,* 988 P.2d at 606 (citing *Department of Health & Soc. Servs. v. Alaska State Hosp. & Nursing Home Ass'n,* 856 P.2d 755, 766 (Alaska 1993)); *Krohn,* 938 P.2d at 1021; *Hayes v. Charney,* 693 P.2d 831, 834 (Alaska 1985).

**19.** The prisoners have neither briefed the mootness issue nor urged us to apply the public policy exception.

**20.** Section IX.B.2 of the settlement agreement states that before filing an action alleging noncompliance with the settlement agreement "[a]n inmate must first exhaust the administrative grievance procedure set out in Section VII.E." Under Section VII.E.1 "[i]ssues involving the propriety of classification and disciplinary decisions may be raised only through an appeal of a classification or disciplinary action, as provided in 22 AAC 05.260 and 22 AAC 05.480, respectively."

procedural due process analysis. And finally, because the mootness problems here stem in part from the fact that Cleary narrowly sought injunctive relief without also requesting a declaratory judgment, it is not clear that future challenges would continue to evade review.

Finding no sound reason to apply the public policy exception, we decline to reach the merits of the cross-appeal, because they are moot.

## IV. *CONCLUSION*

We AFFIRM the superior court's judgment.

FABE, Chief Justice, not participating.