NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |
|---|---|
| KENNETH M. DUFFUS and<br>DEA L. DUFFUS,<br><br>        Appellants,<br><br>        v.<br><br>INDYMAC MORTGAGE SERVICES,<br>a Division of OneWest Bank, F.S.B. and<br>DEUTSCHE BANK NATIONAL<br>TRUST COMPANY, as Trustee of the<br>IndyMac Mortgage Loan Trust 2006-1,<br><br>        Appellees. | Supreme Court No. S-15054<br><br>Superior Court No. 3AN-09-11393 CI<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 1477 - February 19, 2014 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances:  William D. Artus, Anchorage, for Appellants. Richard Ullstrom, RCO Legal-Alaska, Inc., Anchorage, for Appellees.

Before:  Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I.  INTRODUCTION

The superior court granted a motion to enforce a settlement agreement in a foreclosure dispute between rental property owners and their lender.  The property

---

\*     Entered under Alaska Appellate Rule 214.

owners appeal, arguing that the settlement agreement was not binding and should not have been enforced. We affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Kenneth and Dea Duffus owned multiple condominium rental units in Anchorage, including two rental units in the Sun Chase project. In 2007 the Duffuses obtained loans secured by the two Sun Chase units from IndyMac Mortgage Services, a division of OneWest Bank, and Deutsche Bank National Trust Company, trustee of the IndyMac Mortgage Loan Trust 2006-1 (collectively IndyMac). In 2008 the Duffuses defaulted on their loan payments. IndyMac filed notices of default and initiated non-judicial foreclosures of the deeds of trust for the units. The Duffuses attempted to negotiate loan modifications and made payments to IndyMac; the parties do not agree on the results of the modification negotiations or the amount of payments made after the default. In March 2009 the two units were sold at a foreclosure sale.

In October 2009 the Duffuses filed suit against IndyMac. The Duffuses claimed that the foreclosure sale was illegal and requested judgment cancelling the sale, returning the units to them, and requiring IndyMac to accept their payments under modified mortgage terms. Over the next two years, IndyMac and the Duffuses discussed settlement and had a settlement conference with a retired superior court judge.

In 2012 the parties exchanged several emails discussing possible settlement terms. On April 13, in response to a previous settlement offer from the Duffuses, IndyMac proposed a settlement with eight points:

1. OneWest will pay the $15,000 [to the Duffuses];

2. Execution and delivery of the quitclaim deeds by the Duffuses as stated in your message below;

3. The Duffuses will remain in possession of the units until June 15 and the deeds will be recorded on that date;

4. The lawsuit will be dismissed with prejudice, and the Duffuses will release all claims and any notice of lis pendens that they have recorded;

5. If there are tenants in the units, OneWest will be provided with copies of any leases and estoppel certificates from the tenants agreeing that those are the leases, that the rent is as stated in the leases and is paid through date X, that the security deposit is $X, and that the tenants have no claims concerning their occupancy of the units. The Duffuses will surrender to OneWest the amount of the security deposits unless the tenants vacate prior to June 15 and sign an acknowledgment that they have no claim against OneWest or Deutsche Bank for any deposit amount.

6. The Duffuses will permit OneWest access to the units upon execution of the settlement documents to establish the condition of the units and their value for marketing purposes. The Duffuses will be responsible for any deterioration in the condition . . ., normal wear and tear excepted, between that time and June 15.

7. The Duffuses or their tenants will permit access to the units, upon reasonable advance notice, to allow OneWest to show the units to prospective purchasers.

8. OneWest will also want a formal settlement agreement setting out these terms and customary provisions such as each side bearing its own fees and costs.

The Duffuses' lawyer responded on April 13, stating that if IndyMac would change the possession date from June 15 to July 15, "we have a deal." IndyMac's lawyer accepted this counteroffer in an April 16 telephone call.

On April 16 both parties appeared in court and announced that a settlement agreement had been reached. The Duffuses' lawyer stated, "We have . . . the essential terms and will reduce it to writing . . . and get it signed, and file a stipulation of dismissal." The settlement was not put on the record in court.

On April 23 IndyMac's lawyer sent the Duffuses the first version of the "Settlement Agreement" — a six-page document containing the terms agreed to in the emails and additional formal settlement language. The Duffuses' lawyer replied on June 18, requesting "one minor" change to the agreement concerning IndyMac's request for estoppel certificates from the tenants. IndyMac's lawyer changed the agreement to reflect the Duffuses' request.

On June 26 the Duffuses' lawyer sent another email requesting additional "minor changes" to the settlement agreement. The Duffuses' lawyer stated that he "should have the Settlement Agreement signed within a day of receiving the revised Agreement." On July 9 IndyMac's lawyer responded, indicating that he had made most of the requested changes.

At some point between April and July, the Duffuses discovered that IndyMac's parent company, OneWest, had sent negative reports about them to credit reporting companies. The Duffuses believed their defaults and the foreclosure sales were wrongly reported because of the pending lawsuit. The Duffuses' lawyer called IndyMac's lawyer and requested a provision in the settlement agreement expressly acknowledging that the foreclosure sales had taken place in error. On July 16 IndyMac's lawyer emailed the Duffuses' lawyer to say that IndyMac would not agree to that term in the settlement agreement. Following this exchange, the Duffuses refused to sign the written settlement agreement.

## B. Proceedings

In September IndyMac filed a motion to enforce the settlement agreement. IndyMac argued that the settlement agreement constituted a binding contract because the emails between counsel contained all the essential terms of the agreement. IndyMac claimed the Duffuses made a counteroffer in the April 13 email and IndyMac accepted.

The Duffuses opposed the motion. They first argued that IndyMac had violated Alaska Civil Rule 26(a) by failing to disclose the negative credit reports during discovery. They claimed that had they known about the credit reports, they would not have agreed to a settlement without a stipulation that the negative credit reports would be corrected. They also argued that the settlement agreement should be set aside because of mistake; they claimed their mistaken belief that there would be no negative effect on their credit scores was caused by IndyMac's failure to disclose that fact during discovery.

The superior court granted IndyMac's motion to enforce the settlement agreement. The court concluded that the parties had reached an agreement constituting a contract because the essential terms were in place, the emails indicated an intent by both parties to be bound by those terms, and the omitted terms concerning the credit reports were not material. The court also rejected the Duffuses' unilateral mistake defense, determining that the Duffuses bore the risk of the mistake.

The Duffuses appeal the order granting granting the motion to enforce the settlement agreement.

## III. STANDARD OF REVIEW

We review grants of motions to enforce valid settlement agreements de novo.[1] If a valid settlement agreement exists, the superior court has no discretion to decline to enforce that agreement.[2] "We interpret settlement agreements as contracts,"[3]

---

[1] In *Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, we explained that motions to enforce settlement agreements are reviewed de novo because the superior court cannot decline to enforce a valid agreement:

In *Rice v. Denley,* we explained that "the superior court 'has discretion to deny the motion [to enter judgment on a settlement agreement reached on the record] *if the court determines that material issues of fact exist as to the existence of the settlement agreement or to a material term of the settlement.*' " 944 P.2d 497, 499 (Alaska 1997) (emphasis added). The word "discretion" has been used imprecisely in subsequent cases involving settlement enforcement: We have used "discretion" where we simply meant "authority." This imprecision was propagated further in *Worland v. Worland*, 193 P.3d 735, 738 (Alaska 2008); *Mullins v. Oates*, 179 P.3d 930, 935 (Alaska 2008); and *Ford v. Ford*, 68 P.3d 1258, 1263 (Alaska 2003).

Thus, a close review of our precedent makes clear that in the context of settlement enforcement, the word "discretion" refers to the superior court's authority to choose between methods of enforcement, such as whether "to compel [a party] to execute the settlement agreement, or alternatively direct the clerk of court to sign the agreement on [the party]'s behalf." *Pavek v. Curran*, 754 P.2d 1125, 1127 (Alaska 1988). But the superior court does not have broad power to decide whether to enforce a conclusively valid agreement.

252 P.3d 1011, 1015 n.4 (Alaska 2011) (alteration in original) (citations omitted).

[2] *Id*. at 1014-15 ("If we agree, on de novo review, that a valid settlement

(continued...)

and "[i]n the absence of factual disputes, we review questions of contract formation and interpretation de novo."[4]

## IV. DISCUSSION

On appeal, the Duffuses limit their argument to the proposition that they never reached a final and complete agreement with Indymac, but rather had made only an unenforceable agreement to agree.

Mutual assent is an essential element of contract formation.[5] If the parties did not express the intent to be bound by the settlement agreement, then it is not an enforceable contract. "[M]utual assent must be manifested by one party to the other" and "is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties."[6] "In determining the parties' intent, the courts look first to the parties' expressed intentions."[7]

---

[2]     (...continued)
agreement exists, the superior court has no discretion to decline to enforce that agreement.") (citation omitted).

[3]     *Id*. at 1014 (citing *Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001).

[4]     *Id*.

[5]     1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 1.1, at 11 (4th ed. 2007).

[6]     *Id*. at § 4.1, at 322, 325. *See also Kingik v. State, Dep't of Admin. Div. Of Ret. & Benefits*, 239 P.3d 1243, 1251 (Alaska 2010) ("Because a contract is assessed under an objective standard, if a party objectively manifested an intention to be bound by the terms of a contract, that assent cannot be defeated by evidence of the party's . . . subjective contrary intentions." (alteration in original) (quoting *Dutton v. State*, 970 P.2d 925, 928 (Alaska App. 1999) (internal quotation marks omitted)).

[7]     *Juliano v. Angelini*, 708 P.2d 1289, 1291 (Alaska 1985). *Cf. Young v. Hobbs*, 916 P.2d 485, 488-89 (Alaska 1996) (holding superior court erroneously
(continued...)

Here the superior court correctly determined that the parties expressed mutual intent to be bound by the settlement agreement through objective manifestations. The superior court explained that the Duffuses made a counteroffer to IndyMac in the April 13 email by stating, "Make it July 15 and we have a deal," and that IndyMac accepted that counteroffer in a telephone call on April 16. The superior court also noted the Duffuses' statement in open court indicating that the parties had reached an agreement: "We have . . . the essential terms and will reduce it to writing . . . and get it signed, and file a stipulation of dismissal . . . ." These undisputed facts demonstrate an objective intent to be bound by the settlement agreement. And confirmation that the Duffuses had agreed to the settlement is found in the affidavit of Kenneth Duffus: "If I had known that IndyMac or OneWest Bank had provided negative reports on my wife and me to the credit reporting agencies, *I would not have agreed to the settlement . . . .*" (Emphasis added.)

The Duffuses nonetheless contend that additional terms in the final written agreement render mutual assent to the agreement impossible. The Duffuses point specifically to the addition of an indemnification clause and changes in the quitclaim deed language that occurred after April 13.

But this argument rests on the assumption that the terms contained in the counteroffer were not all the "essential terms" of the contract. Here, the parties contracted to end the litigation over the Duffuses' claims regarding the rental properties, specifically the Duffuses' request that IndyMac cancel the foreclosure sale and accept mortgage payments from them. The eight terms in the April 13 emails represent the

---

[7]    (...continued)
enforced settlement agreement when record indicated one party did not intend to be bound).

essential terms of the agreement because they accomplish the parties' central purpose and each term requires performance to effectuate the parties' expectations.[8]

In the weeks following the April 13 emails, both parties made some changes to the settlement agreement. The agreement was typed in a more formal document, titled "Settlement Agreement," and eventually contained 15 terms. In the last version of the settlement agreement, term 9 provides that IndyMac may show the units to prospective purchasers, and terms 10 and 11 acknowledge the voluntariness of the settlement and the knowing release of claims. In addition, term 12 contains a boilerplate integration clause, term 13 concerns confidentiality, term 14 discusses the competence of the parties, and term 15 specifies counterpart originals to be executed. Pursuant to the agreement, IndyMac's lawyer drafted estoppel certificates to be signed by the rental units' tenants and quitclaim deeds to be signed by the Duffuses. These additional terms concerned details and formalities associated with settlement agreements, and the estoppel certificates and quitclaim deeds merely effectuated essential terms of the April 13 emails.

Courts generally do not find contracts unenforceable merely because the parties left nonessential terms or details to be addressed later.[9] Ongoing negotiations

---

[8] *See Alaska Creamery Prods. Inc. v. Wells*, 373 P.2d 505, 510 (Alaska 1962).

[9] *See, e.g.*, *Coe v. Chesapeake Exploration, L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012) ("Although the parties must agree to all material terms, they may choose to leave non-essential terms open for later negotiation without rendering the agreement unenforceable." (citing *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 645 (Tex. App. 2010))); *Eckles v. Sharman*, 548 F.2d 905, 909 (10th Cir. 1977) ("If a contract has been agreed upon and all that remains is good faith negotiations or elaboration of non-essential terms, the contract will be held legally cognizable despite the uncertainties." (citing *White Point Co. v. Herrington*, 73 Cal. Rptr. 885, 889 (Cal. App. 1968))); *Butler v. Attwood*, 369 F.2d 811, 816 (6th Cir. 1966) ("Even though

(continued...)

may add or modify nonessential terms in an otherwise enforceable contract. Here, although "minor" changes to the settlement agreement and its terms were made after April 13, some of those changes were at the Duffuses' request. A party cannot say that it never intended to agree to changes that it proposed, and there is no indication in the record that the Duffuses contested, or even now contest, any of the actual changes. Indeed, the only term in dispute is the requested, but unaccepted, provision stating that the foreclosure sales had taken place in error. But the settlement agreement was reached in April and there was never any discussion about including that provision in the agreement until July.

## IV.   CONCLUSION

We AFFIRM the superior court's order enforcing the settlement agreement.

---

**9**      (...continued)
certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement." (quoting 1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 29, at 89, 90 (1st ed. 1963)) (quotation marks omitted)).