*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, | ) ) ) ) | Supreme Court Nos. S-15380/15649 Superior Court No. 3AN-09-11426 CI |
| Appellant, | ) ) ) | O P I N I O N |
| v. | ) ) | No. 7129 – October 21, 2016 |
| ALASKA LASER WASH, INC., an ALASKA CORPORATION, | ) ) ) ) | |
| Appellee. | ) ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Dario Borghesan, Assistant Attorney General, Dana Burke, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellant. Stephen M. Dodge, Austin, Texas and Kevin T. Fitzgerald, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Fabe, and Bolger, Justices. [Winfree and Maassen, Justices, not participating.]

STOWERS, Chief Justice.
FABE, Justice, dissenting in part.

## I.      INTRODUCTION

The State of Alaska and the owner of a car wash reached an agreement for

the State to acquire the car wash site as part of a highway improvement project. After the State acquired the site, the owner elected not to relocate the car wash. The owner then brought an inverse condemnation suit against the State, claiming business damages resulting from the State's acquisition. At the close of a jury trial the superior court denied the State's motion for a directed verdict; the jury awarded the owner $1.79 million in damages and the court awarded attorney's fees and costs. The State appeals, arguing that the owner's claimed damages are not compensable because it was feasible for the owner to relocate the car wash after the State acquired the original site. We agree with the State that feasibility is the correct standard for analyzing the owner's decision not to relocate when deciding whether he is entitled to business damages. We reverse the superior court's denial of the State's motion for directed verdict, vacate the attorney's fee and costs awards, and remand for reconsideration of prevailing party status, attorney's fees, and costs.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Trefry forms and expands Alaska Laser Wash.

In 1995 George Trefry formed Alaska Laser Wash, Inc.; in 1996 he left the practice of law to build his first Alaska Laser Wash car wash near the intersection of Spenard Road and Minnesota Avenue in Anchorage. In 1998 Trefry opened another car wash on Fifth Avenue; this location included four touchless car wash bays, an espresso shop, a water store, storage, and offices. And in 2004 Trefry opened a six-bay car wash in South Anchorage near the intersection of Old Seward Highway and O'Malley Road. Alaska Laser Wash was the first touchless car wash in Alaska. However, by 2004 Anchorage had 41 touchless car wash bays, 14 of which Trefry owned. By 2010 there were 65 touchless car wash bays in the city.

Alaska Laser Wash was an integrated car wash business, and Trefry chose

the three Alaska Laser Wash locations to maximize his company's coverage of the city and customer convenience, based on a study of demographics and traffic patterns. Each Alaska Laser Wash site was electronically linked to the others, such that a customer could purchase a "WashCard" or "Laser Wash Token" offsite or at any Alaska Laser Wash facility for use at any Alaska Laser Wash location. Each location depended on the others to generate sales, and advertising at one location often resulted in sales of WashCards and Laser Wash Tokens benefitting the other locations. Alaska Laser Wash also enjoyed other economies of scale by using shared personnel, storage, parts, and other expense items. By 2004 technological advances allowed Alaska Laser Wash to offer synergized car wash services throughout the city, meaning that customers could access any of Alaska Laser Wash's 14 bays 24 hours a day, seven days a week. Alaska Laser Wash also allowed customers to track and pay for washes and generate usage and tax reports online, which reduced customers' — particularly businesses', fleet owners', and government agencies' — drive times, administrative expenses, and related costs. Alaska Laser Wash was the only car wash business in Anchorage to hire a full-time sales and marketing director.

Trefry claimed that the Fifth Avenue car wash was Alaska Laser Wash's most important location and that it contributed nearly 40% of the company's net operating income. Trefry further claimed that the Fifth Avenue car wash was ideal because Fifth Avenue was heavily trafficked by daily commuters and because the location was near a prime business district, military bases, and multiple car dealerships. The Fifth Avenue car wash was also highly visible and accessible to traffic traveling in both directions on the street.

**2.      The State acquires Alaska Laser Wash's Fifth Avenue car wash.**

In March 2006 the State notified Trefry that it intended to acquire the Fifth Avenue car wash as part of its Glenn Highway improvement project. Trefry asserted that this announcement "had a profound and dramatic effect" on Alaska Laser Wash: his company halted its business and promotional plans; eliminated its sales and marketing director position; abandoned its expansion plans; faced high costs and lower margins due to lost economies of scale and increasing operational expenses; lost sales, market share, and profitability; and suffered business damages.

In September 2006, after having the site appraised, the State offered Trefry $3.45 million for the Fifth Avenue car wash. This valuation used an "income approach" to approximate the Fifth Avenue car wash's value, an approach that estimates value based on the anticipated future revenue stream of a property.[1] This valuation included tangible assets, such as the land, building, furniture, and equipment, as well as intangible assets, such as the workforce, patents, and economic profits.

In October 2006 Trefry counteroffered to sell the Fifth Avenue car wash for $5.85 million, contending that the State's offer incorrectly appraised both actual income and capitalization rates due to certain unique aspects of Alaska Laser Wash. In

---

[1]      The income approach "is concerned with the present worth of future benefits from the property" and "arrives at present value by discounting or 'capitalizing' the future income which could be derived from the property." *Dash v. State*, 491 P.2d 1069, 1071 (Alaska 1971). "The income capitalization method involves three steps: (1) an estimate of the income which the property is capable of producing, including both periodic income and the income to be derived from future sale of the property; (2) an estimate of the rate of return (capitalization rate) an investor would require in order to induce him to make an investment with the risk and lack of liquidity of an equity interest in the particular property; (3) an application of this capitalization rate to the estimated income to derive the present value of the estimated income." *Horan v. Kenai Peninsula Borough Bd. of Equalization*, 247 P.3d 990, 995 (Alaska 2011) (quoting *Dash*, 491 P.2d at 1071).

this counteroffer Trefry reserved the right to pursue business damages that the State had previously refused to consider or evaluate, particularly damages to Alaska Laser Wash's other properties, incidental losses, and temporary lost profits. The State advised Trefry that it would not consider an offer containing a reservation of rights. Trefry then made an alternative counteroffer without reservation in the amount of $7,153,450.

In January 2007 Trefry spoke with the State's acquisition agent and agreed to accept $5 million for the property. The State's acquisition agent recommended that the State purchase the property for this price, explaining that the State could justify the higher price by some of the adjustments Trefry discussed in his counteroffer. After a further dispute as to whether the State would pay for the storage, relocation, and reinstallation of fixtures on the property, the parties revised the sale price to $5.36 million in April 2007. The State prepared a report on the transaction and indicated that the $1.9 million price difference between the State's initial offer and the agreed sales price was an "administrative settlement."

The parties drafted a Memorandum of Agreement for this transaction in April 2007 and approved the memorandum the following month. This memorandum did not reserve the right to sue for business damages, but Trefry asserted that right in a separate letter sent on the date he signed the memorandum. Of the $5.36 million purchase price, $1.44 million went to the bank to pay off the mortgage on the property, and Trefry kept the remaining $3.92 million.

**3.      Trefry decides not to open a new Alaska Laser Wash location.**

During the acquisition process, the State informed Trefry of the benefits the State offers owners of condemned properties to help them move their business to a new

location.[2] Trefry accepted a $20,000 lump sum relocation payment instead of relocation assistance and reimbursement of actual moving expenses. But despite finding available sites correctly zoned for car washes, having the funds to build a car wash on one of those sites, and expressing confidence that Alaska Laser Wash would prosper at alternate locations, Trefry decided not to open a new location after receiving the funds from the State. Trefry claimed that there was no single equivalent substitute for the Fifth Avenue car wash; he asserted that he would need to open at least two locations to replace the economic benefits of the Fifth Avenue car wash, that each location would cost approximately $3.5 million, that he lacked these funds, that it would take at least three years to open the alternate locations due to construction cycles, and that the litigation related to this case would tie up financial and other resources for the foreseeable future.

### 4.     Trefry sells Alaska Laser Wash to the Laudon Group.

Trefry instead decided to leave the car wash business altogether, and he sold the entire Alaska Laser Wash business to the Laudon Group in March 2008. The Laudon Group paid Trefry $6.95 million for the business; Trefry contended that this sum did not include any of the business damages he claimed in this action. Trefry's profit from the transaction was $2.95 million. The new owners proceeded to build another Alaska Laser Wash location on the Fifth Avenue location that Trefry had considered as a replacement for his original Fifth Avenue car wash. The new owners also built new

---

[2]     Federal regulations require the State to provide these benefits in all federally-funded transportation projects. 49 C.F.R. §§ 24.301, 24.305 (2016). These tax-free benefits include reimbursement for (1) the cost of using a professional mover or the cost of moving the business; (2) up to twelve months of storage costs and insurance; (3) time spent searching for replacement property and obtaining permits, up to $2,500; (4) professional services to help determine the feasibility of potential replacement sites; (5) professional services to help plan the move and install property at the new site; and (6) repairs, improvements, or modifications to the replacement site, up to $10,000.

car wash locations on three other sites that Trefry had considered.

**B.      Proceedings**

**1.      Trefry files suit against the State.**

In October 2009 Trefry filed an inverse condemnation claim against the State in the name of Alaska Laser Wash. Trefry argued that the State's acquisition of the Fifth Avenue car wash led to "business interruption and uncompensated losses and damages, including, but not limited to, temporary lost profits, lost business profits, lost business opportunities and value, lost goodwill, lost going concern value[,] and other consequential and incidental damages." Trefry requested declaratory judgment, compensatory damages, pre- and post-judgment interest, and attorney's fees and costs.

**2.      The State moves for summary judgment.**

The State moved for summary judgment on three grounds. First, the State argued that it did not take Alaska Laser Wash's Spenard or Old Seward locations and, therefore, Trefry could not recover losses pertaining to those locations. Second, it argued that because Trefry feasibly could have relocated the Fifth Avenue car wash, he could not claim lost goodwill, lost going concern value, temporary lost profits, or other incidental damages. Third, it argued that the $5.36 million settlement included compensation for lost profits, that the $6.95 million sale of the other locations included compensation for some of the same elements that Trefry sought to recover in his lawsuit, and that awarding further business damages would therefore amount to double compensation.

The superior court denied the State's motion for summary judgment. First, the court held that, looking at Alaska Laser Wash "as a whole," there was a genuine issue of material fact whether the business suffered losses — that is, whether the State damaged "the business as a whole" — when it condemned the Fifth Avenue car wash. But the court also explained that Trefry could not recover "damages related solely to his

geographically separate and non-unified Spenard and South Anchorage facilities." Second, the court held that the matter of relocation was essentially a question of mitigation of damages and that there was a genuine issue of material fact whether it was reasonable for Trefry to relocate the Fifth Avenue car wash. Third, the court rejected the State's double compensation argument, finding that there was a genuine issue of material fact whether the sale price of the Spenard and Old Seward locations was lower than it would have been had the State not condemned the Fifth Avenue car wash.

### 3. The case proceeds to trial.

The case proceeded to trial in 2011. Shortly after the trial commenced, one of Alaska Laser Wash's attorneys became ill, and the court declared a mistrial. Following the mistrial, the State again moved for summary judgment, but the superior court denied that motion citing genuine issues of material fact.

In 2013 a new trial commenced before a different judge, and the State filed a third motion for summary judgment. The superior court also denied that motion, holding that Trefry had provided sufficient evidence that "the condemnation of the Fifth Avenue [car wash] potentially diminished the . . . remaining property interests" and that, therefore, it was still in dispute whether Alaska Laser Wash had "suffered a compensable taking to its 'business as a whole.' " The court found that Trefry's affidavit and his expert's projections that the acquisition of the Fifth Avenue car wash "potentially diminished the value of Laser Wash's remaining property interests" provided sufficient evidence to send to the jury the question whether there was a compensable taking of the "business as a whole."

During these proceedings the superior court invited the parties to file cross-motions regarding the burden of proof applied to the relocation issue. The State argued that the burden "falls on the business owner to 'show relocation to be impossible, or at least, impractical,' " in essence a feasability standard. Trefry argued that the State

must show that the business owner unreasonably failed to mitigate damages, a reasonableness standard.  The superior court agreed with Trefry that a business owner "has the duty to mitigate its business loss damages arising incident to the condemnation of its real property if, but only if, it is reasonable to do so."  The superior court also ruled that the "burden of proving mitigation or the failure to mitigate falls on the State."  At trial, the superior court instructed the jury that Alaska Laser Wash was entitled to recover damages unless the State showed that some or all of the damages "could have been avoided with reasonable efforts and without undue risk, expense, hardship, or embarrassment."

Testimony during the 24-day trial focused on (1) whether Trefry could have relocated his car wash to a new site; (2) whether the State's acquisition of the Fifth Avenue car wash caused financial losses; and (3) what the State's $5.36 million payment for Trefry's Fifth Avenue car wash encompassed.

On the first issue, Trefry conceded that the $3.9 million in cash he netted from the sale of the Fifth Avenue car wash was enough to enable him to obtain the financing necessary to build another car wash.  He also conceded that there were several parcels of land available that were correctly zoned for car washes and that he found many suitable places to build a car wash.

On the second issue, Trefry's witnesses testified about the premium location of the original Fifth Avenue car wash.  But the State's appraiser, Jerry Smith, testified that the new Fifth Avenue car wash was comparable to the original site.  Trefry also relied on testimony from Susan Spyker, an expert in business valuation, to estimate business damages resulting from the loss of the original Fifth Avenue car wash.  Spyker estimated that Alaska Laser Wash lost $5.38 million due to the State's taking.  In contrast, the State's business valuation expert, Robert Meyer, concluded that Alaska Laser Wash did not incur any loss of business value as a result of the State's acquisition

of the Fifth Avenue car wash. He also testified that each of the remaining Alaska Laser Wash locations experienced an increase in revenue after the State's acquisition of the Fifth Avenue car wash.

On the third issue regarding what the State's $5.36 million payment for the Fifth Avenue car wash encompassed, Smith testified that the State's original appraisal that formed the basis for the State's initial $3.45 million offer was based on an income approach to valuation that included both tangible and intangible assets, such as the workforce and economic profits. Smith testified that the State's eventual $5.36 million payment was "exorbitantly high" and that the capitalization rate used in reaching that sum was inappropriate. The State's right of way chief,[3] Robert Wright, also explained that the State paid $1.9 million above its original $3.45 million offer because the State wanted to avoid further delay in its expansion project and did not want to risk losing a construction season.

The State moved for a directed verdict at the close of trial,[4] but the superior court denied its motion. The jury then deliberated and entered a special verdict finding that: (1) the State's acquisition of the Fifth Avenue car wash damaged the business as a whole; (2) the damage to Alaska Laser Wash's business as a whole resulted in measurable loss; (3) the State owed just compensation to Alaska Laser Wash in the amount of $1,793,450; (4) the parties did not agree that business damages were included in the original $5.36 million payment; and (5) Alaska Laser Wash did not unreasonably

---

[3]     The State's right of way chief is the "supervisor of the appraisal, acquisition, and relocation section of the Department of Transportation and Public Facility."

[4]     The State argued that relocation was feasible. The State specifically argued that Trefry's testimony that "it would take two locations to make what he could have made at [the] Fifth [Avenue site]" was "not supported by any kind of business analysis," was "pure speculation," and was "not even helpful to the jury."

fail to lessen its damages by refusing to relocate.

### 4. Alaska Laser Wash moves for attorney's fees and costs.

Alaska Laser Wash moved for an award of attorney's fees against the State, including fees for legal services provided by Kevin Fitzgerald, Stephen Dodge, and George Trefry. Dodge, who lives in Texas, served as Alaska Laser Wash's counsel for both the first and second trials. Fitzgerald joined the case after Dodge's illness resulted in the mistrial of the first trial. Trefry, who was both the owner of Alaska Laser Wash and a lawyer in good standing with the Alaska Bar, sat through both trials and claimed he acted as counsel through his participation in the case. Trefry also sought an assessment of $281,867 in costs incurred throughout the proceedings.

The superior court awarded $633,935 in attorney's fees and $135,420 in costs. The court's award included only the attorney's fees and costs incurred through the first trial; it excluded fees and costs incurred after the first trial and the fees Trefry sought for his own time. The court denied various other costs, including costs for Dodge's travel between Texas and Alaska; accounting costs it deemed duplicative; costs for the work of an employee performed "within the scope of her regular duties"; and some process server and transcript preparation costs incurred after the first trial. The court did award $101,885 in costs for 403 hours of time spent by Alaska Laser Wash's accounting experts.

### 5. The State and Alaska Laser Wash appeal to this court.

The State appeals the jury verdict and various rulings made by the superior court. Alaska Laser Wash cross-appeals the court's adverse rulings on attorney's fees and costs. These two appeals have been consolidated.

## III. STANDARD OF REVIEW

"Whether the superior court applied the correct legal standard is a question of law that we review de novo, 'adopting the rule of law that is most persuasive in light

of precedent, reason[,] and policy.' "[5]

We review the denial of a motion for a directed verdict for "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors."[6]

## IV.    DISCUSSION

### A.    A Business Owner Whose Property Is Taken By The State May Recover Business Damages So Long As It Was Not Feasible For The Business To Relocate.

Both parties agree that the business damages Trefry seeks in this eminent domain case fall into the category of "special damages."[7]  Generally, a business owner may not recover special damages unless he shows with "reasonable certainty" the amount of losses that are a "direct result of the [S]tate's taking."[8]  Determining whether Trefry's losses are a direct result of the State's taking requires us to clarify the legal standard to apply to Trefry's decision not to relocate.  The State argues that Trefry may recover business damages only if he proves that relocation of the Fifth Avenue car wash

---

**5**      *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011) (quoting *McQuade v. McQuade*, 901 P.2d 421, 423 n.3 (Alaska 1995)).

**6**      *Cameron v. Chang-Craft*, 251 P.3d 1008, 1017 (Alaska 2011) (quoting *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983)).

**7**      Special damages are losses that "do not necessarily or even usually flow from the condemnation of land."  *Triangle, Inc. v. State*, 632 P.2d 965, 974 (Alaska 1981) (Connor, J., dissenting in part).

**8**      *State v. Hammer*, 550 P.2d 820, 827 (Alaska 1976) ("Since such loss of profits is an item of special damages, the condemnee has the burden of proving by a preponderance of the evidence the amount of profits lost as a direct result of the state's taking; such proof must meet the requirement of reasonable certainty as indicated." (footnote omitted)).

was not feasible. Trefry, in contrast, argues that a business has a duty to mitigate its damages if it is reasonable to do so; he contends that Alaska Laser Wash may recover special damages unless the State proves it was not reasonable to relocate. The superior court applied Trefry's reasonableness standard.

We have not explicitly determined whether a feasibility or a reasonableness (mitigation) standard should apply when analyzing a property owner's relocation decision in determining an award of special damages, such as business damages. But a leading treatise on eminent domain states, "In jurisdictions permitting compensation for loss of goodwill, it is generally required that the business owner show relocation to be impossible or at least impracticable."[9] And cases from other jurisdictions also suggest that the State's taking directly results in business damages only if no other feasible location exists. The Michigan Court of Appeals held that the recovery of going concern value "depend[s] on the transferability of that business to another location" because "[i]f the business can be transferred, nothing is taken and compensation is therefore not required."[10] The Michigan Court of Appeals has applied this doctrine in other cases as well, allowing business owners to recover for lost goodwill when relocation was not feasible and refusing to compensate when relocation was feasible.[11] The Minnesota

---

[9]     8A NICHOLS ON EMINENT DOMAIN § G29.03[3][b] (3d ed. 1964).

[10]     *City of Detroit v. Michael's Prescriptions*, 373 N.W.2d 219, 224 (Mich. App. 1985).

[11]     *See, e.g.*, *City of Lansing v. Wery*, 242 N.W.2d 51, 54-55 (Mich. App. 1976) (permitting a hamburger shop to recover lost goodwill because no "remotely comparable" location was available when the shop depended greatly on its walking distance from the city's commercial center); *City of Detroit v. Whalings, Inc.*, 202 N.W.2d 816, 820 (Mich. App. 1972) (declining to allow the owner of a men's clothing store to recover lost goodwill because its value did not "derive primarily from its location; it [did] not enjoy a monopoly, and its customers [were] not a captive

Supreme Court applied similar reasoning when it reversed an award of lost goodwill to a restaurant owner who did not successfully demonstrate that relocation was not possible.[12] The Minnesota Supreme Court reasoned that "[u]nder circumstances where the business can potentially be relocated, the condemnation has only taken the physical property and has not prevented the business owner from actually moving his business."[13] The Nevada Supreme Court has also held that when a business is tied to the condemned location so that it is impossible to relocate without destroying the entire value of the business, the owner can claim lost goodwill and going concern value.[14]

The State agrees with this line of reasoning, arguing that a business owner who refuses to relocate should be able to collect business damages only when relocation is not feasible. The State specifically argues that when a business owner may feasibly relocate, the State's condemnation of the property does not directly result in any loss of goodwill or going concern value because the relocated business would retain that value. When it is feasible to relocate but the business owner chooses not to do so, any loss of goodwill and going concern value would then result from the business owner's choice not to relocate rather than the State's taking. Under this circumstance the owner would have been fully compensated for the loss of his property in the eminent domain settlement.

---

[11] (...continued)
audience").

[12] *Hous. & Redevelopment Auth. of St. Paul v. Lambrecht*, 663 N.W.2d 541, 549 (Minn. 2003).

[13] *Id.* at 548.

[14] *State v. Cowan*, 103 P.3d 1, 4 (Nev. 2004) (holding that a gas station owner can recover lost goodwill for his condemned business because he presented evidence that oil companies had stopped leasing new gas station franchises in his area).

In contrast, Trefry asserts that the feasibility test should not apply in Alaska and that we should instead consider a business owner's relocation decision under the same standard that we apply when analyzing questions involving mitigation of damages. Under this standard, Trefry argues that "Alaska Laser Wash had a duty to mitigate its damages, but that duty arose only if it was reasonable to do so" and that Alaska Laser Wash could recover damages if it were not reasonable to relocate. Trefry contends that there are distinct differences between Alaska and the other jurisdictions adopting the feasibility standard that we cite here. Trefry claims that these differences make precedent from these other jurisdictions inapplicable with regard to this issue. Trefry explains that in those states the "general rule" is that the State is not required to pay any claim for business damages arising from the taking of the land where the business is located but that those states have carved out an exception to this general rule, permitting business owners to collect business damages if relocation is not feasible.[15] Trefry argues that because we have rejected outright the "general rule" that the State is not required to pay any claim for business damages arising from the taking of the land where a business is located,[16] we cannot, by extension, adopt the exception to that general rule.

We agree with the State and the rationale of the Minnesota, Michigan, and Nevada courts cited above that feasibility, rather than reasonableness, is the correct standard for analyzing whether a business owner may recover business-loss damages when the State condemns the business owner's property. And we disagree with Trefry's

---

[15]     *See, e.g.*, *Michael's Prescriptions*, 373 N.W.2d at 219; *City of Minneapolis v. Schutt*, 256 N.W.2d 260, 263 (Minn. 1977) (recognizing an exception only when a business can show that its going concern value will be destroyed and the business cannot be relocated); *Cowan*, 103 P.3d at 4 (recognizing an exception when the condemnation results in the destruction of a business because it cannot be relocated).

[16]     *State v. Hammer*, 550 P.2d 820, 827 (Alaska 1976).

counterargument that the precedent from other jurisdictions we cite here is inapplicable. We view these other jurisdictions' decisions to adopt the feasibility standard as an independent line of reasoning explaining how courts in those other jurisdictions consider relocation in the context of an award of business damages. Even though in those jurisdictions that line of reasoning serves as an exception to a general rule holding that the government need not pay any claim for business damages arising from the taking of the land where the business is located, a rule which we have not adopted. Trefry fails to offer any persuasive support for his contention that we are prohibited from adopting that independent line of reasoning.

We hold that a business owner may recover business damages when the State condemns the business only if it is not feasible for the business owner to relocate; if it is not feasible for a business owner to relocate, the State's taking is "reasonabl[y] certain[]" to have directly damaged the value of the business, requiring compensation.[17] The superior court concluded that a business owner "is only required to relocate when it is reasonable to do so." We reject the superior court's approach and hold that the superior court applied the wrong standard in the context of awarding business damages when analyzing Trefry's decision not to relocate.

## B. It Was Error To Deny The State's Motion For A Directed Verdict.

The State argues that it should have prevailed on its motion for a directed verdict after the second trial because "it was undisputed, before and after trial, that it was technically feasible and commercially viable for Trefry to re-open [the] car wash." We review the denial of a motion for directed verdict for "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among

---

[17]     *Id.*

-16-                                                                          **7129**

reasonable jurors."[18]

Evidence presented at trial included Trefry's admission that he probably could have obtained financing to build another car wash at a different location with the $3.9 million in cash he netted from the State's acquisition of the Fifth Avenue car wash; Trefry's testimony that there was plenty of land in Anchorage correctly zoned for car washes; Trefry's admission that he had identified many "good places" to build a car wash in Anchorage; Trefry's admission that he had been looking at a site down the street from the original Fifth Avenue car wash and that Alaska Laser Wash's new owners actually built a new car wash on that exact site; Trefry's admission that he was aware of other sites for car washes and that he suggested particular sites to Alaska Laser Wash's new owners; and the fact that Trefry assured Alaska Laser Wash's buyers that "increasing sales and continued profitability are almost unavoidable" if they expanded onto the sites he suggested. Under our holding today, to receive compensation for business damages, a business owner must show that relocation was infeasible. "Feasible" means "[c]apable of being accomplished or brought about; possible,"[19] and feasibility is a lower threshold than reasonableness. Applying this legal standard to the facts listed above, we conclude no reasonable juror could disagree that it was feasible for Trefry to relocate the car wash. Trefry clearly could have opened a car wash at another location because of the undisputed availability of sites upon which to relocate the Fifth Avenue car wash, Trefry's conceded ability to obtain financing, and the undisputed fact that Alaska Laser Wash's new owners successfully built additional locations on the very sites Trefry himself considered and recommended that the new owners consider for

---

[18]     *Cameron v. Chang-Craft*, 251 P.3d 1008, 1017 (Alaska 2011) (quoting *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983)).

[19]     *Feasible*, AMERICAN HERITAGE DICTIONARY (5th ed. 2014).

relocation. Therefore, it was error for the superior court to deny a directed verdict for the State because there was no room for a diversity of opinion among the jurors on the issue of the feasibility of relocation.

## V.    CONCLUSION

We REVERSE the superior court's denial of the State's motion for directed verdict, VACATE the attorney's fee and costs awards, and REMAND for reconsideration of prevailing party status, attorney's fees, and costs.

FABE, Justice, dissenting in part.

I agree with the court that feasibility rather than reasonableness is the correct legal standard to be applied. And I agree that, on the record in this case, the question of the feasibility of relocating the Fifth Avenue Laser Wash can be decided as a matter of law in favor of the State. But I disagree with the court's implicit conclusion that a directed verdict on the question of feasibility resolves all of the potential damages claims in this case. Even if it is feasible for a business to relocate, the business may incur damages for lost profits while it relocates, or, as in this case, while it attempts to sell the business. I would therefore remand the case on the limited issue of lost-profits damages.

In *State v. Hammer* we recognized that a business owner can recover special damages when the State takes his business property through its power of eminent domain.[1] We discussed lost profits as a type of "business interruption" for which the State could be liable, so long as the business owner could prove his damages with reasonable certainty.[2] Our discussion of lost profits did not suggest that lost profits were part and parcel of a business's value. To the contrary, we noted that because the State could control the amount of damages by, for example, "giving precise and early notice," a business owner could claim lost profits as additional compensation.[3]

One of the damages claims set out by Trefrey in his complaint was "temporary lost profits." Those damages were pleaded separately from other types of business damages, such as "lost business opportunities and value" and "lost goodwill." Because Trefrey adequately alleged lost profits as an item of special damages, he should have the opportunity to recover the amount of those damages proved with reasonable

---

[1]     550 P.2d 820, 823-27 (Alaska 1976).

[2]     *Id.* at 827.

[3]     *Id.*

-19-                                              7129

certainty. The State contends that Trefrey's claim for lost profits is "inapposite" because he did not reopen the business and sold it instead. But the sale followed the closure of the Fifth Avenue location by several months, leaving a time period during which the business presumably suffered lost-profits damages. Those damages are not so speculative that they cannot be proved with reasonable certainty; at a minimum a business owner could present evidence of profits during the same time period immediately preceding the taking. In my view, Trefrey should be afforded the opportunity to prove and recover damages for lost profits on remand.

The disputed valuation of Trefrey's property taken through eminent domain was the subject of negotiations that spanned many months, and the parties ultimately entered into a settlement of their dispute, with the State paying Trefrey $5.36 million. One of the central contested issues at trial here was the scope of the settlement: The State contended that it had "increased its valuation" in part based on "the growth potential and income history" of the Fifth Avenue location, while Trefrey argued that any damage to the business was "separate and distinct from the value of the real property" and thus not the subject of the settlement.

Settlement agreements are interpreted as contracts,[4] and when there are no factual disputes, "we review questions of contract formation and interpretation de novo."[5] But "[t]he intent of the parties when entering a contract is a question of fact" that is "reviewed under the clearly erroneous standard [of review]."[6] The jury in this case was asked to determine whether "the parties agree[d] that business damages were

---

[4]     *Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, 252 P.3d 1011, 1014 (Alaska 2011) (citing *Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001)).

[5]     *Id.* (citing *Copper River Sch. Dist. v. Traw*, 9 P.3d 280, 283 (Alaska 2000)).

[6]     *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 712 (Alaska 2003).

included" in the amount the State paid pursuant to the settlement. And the jury found that they were not. The jury's finding should be an adequate indication that the purpose of the settlement was not so clear as to merit a judgment as a matter of law in favor of the State on this issue. And while the State alleges that Trefrey accepted an additional small sum as a relocation settlement, the record citation in its brief does not support its assertion. In my view, the purpose of any additional funds Trefrey may have accepted is not established on this record as a matter of law.

Because the parties' intent in agreeing to the settlement cannot be determined as a matter of law, I respectfully dissent from the court's ordered remedy of a remand solely for reconsideration of prevailing party status, attorney's fees, and costs. I would remand the case to the trial court on the limited question of lost-profits damages to Trefrey for the period of time from the taking until the sale of the business.