**Edward M. BABINEC and Martha Babinec, Appellants,**

v.

**STATE of Alaska, Appellee.**

**No. 1539.**

Supreme Court of Alaska.

July 20, 1973.

---

9. Robinson v. State, 492 P.2d 106, 107 (Alaska 1971).

Kenneth D. Jensen, Jensen & Harris, Anchorage, for appellants.

John E. Havelock, Atty. Gen., Juneau, Dennis L. Marvin, Richard P. Kerns, Asst. Attys. Gen., Anchorage, Donald J. Beighle, Asst. Atty. Gen., Juneau, Richard Richards, Sp. Counsel for the State of Alaska, Los Angeles, Cal., for appellee.

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

## OPINION

BOOCHEVER, Justice.

The instant appeal arises out of an eminent domain proceeding in which the State of Alaska condemned and acquired a fee simple interest in certain private property belonging to Edward M. Babinec and Martha L. Babinec [1] for the purpose of realigning and improving a highway. On this appeal the Babinecs claim as error various superior court orders, rulings and instructions, in particular, the manner in which the court regulated valuation testimony. Ultimately, the Babinecs challenge the amount of compensation awarded them by the jury.

Prior to the condemnation, the Babinecs owned approximately 65 acres of contiguous land, bordered by the Old Seward Highway on the west, 36th Avenue on the south, LaTouche Street on the east, and a 10-acre leasehold estate, now the site of the Valu-Mart discount store, on the north.

---

1. Edward M. Babinec and Martha L. Babinec are the only parties claiming a right to just compensation in this action. All other defendants were severed from the case by a series of motions, disclaimers and stipulations.

Most of the westerly property of the Babinec ownership was zoned for commercial use while the eastern, LaTouche Street frontage was generally zoned for residential use.

Prior to the condemnation, the Babinecs had made certain improvements to their property. A subdivision, "Southridge Subdivision", was platted. The plat divided their property into one large tract, Tract 1, to the north and two smaller tracts, Blocks 1 and 2, running along 36th Avenue to the south. Tract 1 consisted of about 54 acres of undivided property. Blocks 1 and 2 were subdivided into six lots, five of which fronted onto 36th Avenue with a sixth fronting onto Southridge Drive, an interior street separating the two blocks and running perpendicular to 36th Avenue. Certain utilities had been installed and Southridge Drive was developed to subgrade. One lot was sold while another was leased. Exhibit I of the appendix to this opinion depicts the property prior to the filing of the Declaration of Taking.

The original action to condemn and take for public use a portion of the Babinecs' property was commenced on August 2, 1968 when the State filed its Complaint and Declaration of Taking with the superior court, as authorized by AS 09.55.420.[2]

The property condemned by the State, described in the Complaint and Declaration of Taking as "Parcel No. A–348" and "Parcel No. A–345", consists of approximately 9.09 acres of land. Specifically, Parcel No. A–348 was taken from Tract 1, and Parcel No. A–345 was taken from Block 2. The total take comprised one long strip of land running roughly north to south across the western edge of the Babinecs' 65 acres. Exhibit II of the appendix to this opinion depicts the property taken.

On the same day that the State filed its declaration, it deposited a sum of money, estimated to be just compensation for the property taken, with the registry of court.[3]

An Amended Complaint and Declaration of Taking were filed by the State which altered the description of Parcel No. A–345 slightly by expanding the size of the take so as to seal off the south end of Southridge Drive. The estimated compensation for the entire take, however, was not increased.

The superior court ordered that the funds deposited with the registry as estimated just compensation for Parcels No. A–345 and No. A–348 be disbursed to the Babinecs pursuant to AS 09.55.440[4] and

2. The Department of Highways of the State may acquire real property for the purpose of constructing a highway through the exercise of eminent domain power, under the authority of AS 19.05.040, AS 19.05.080–120 and AS 19.20.040. AS 09.55.420 specifically authorizes the State to use a Declaration of Taking.

3. The amount of money estimated to be just compensation for the property taken and deposited with the registry of court was as follows:

| | | |
|---|---|---|
| Parcel No. A–345 | — | $ 65,000.00 |
| Parcel No. A–348 | — | $125,750.00 |
| Total | | $190,750.00 |

4. AS 09.55.440 provides:
   *Vesting of title and compensation.* (a) Upon the filing of the declaration of taking and the deposit with the court of the amount of the estimated compensation stated in the declaration, title to the estate as specified in the declaration vests in the plaintiff, and that property

is condemned and taken for the use of the plaintiff, and the right to just compensation for it vests in the persons entitled to it. The compensation shall be ascertained and awarded in the proceeding and established by judgment. The judgment shall include interest at the rate of six per cent per year on the amount finally awarded which exceeds the amount paid into court under the declaration of taking. The interest runs from the date title vests to the date of payment of the judgment.

(b) Upon motion of a party in interest and notice to all parties, the court may order that the money deposited or a part of it be paid immediately to the person or persons entitled to it for or on account of the just compensation to be awarded in the proceedings. If the compensation finally awarded exceeds the amount of money deposited, the deposit shall be offset against the award. If the compensation

Alaska Civil Rule 72.[5] At the hearing for a determination of the authority and necessity for the condemnation of the property, the superior court issued an order of condemnation and possession. The order confirmed the condemnation and vesting of a fee simple interest in Parcels No. A–345 and No. A–348 in the State. Pursuant to timely objection, and in accordance with Civil Rule 72(h)(2),[6] the issue of just compensation was not referred to a master's hearing, but rather was tried before a jury.

A series of pretrial conferences was held and a month-long trial ensued. At the conclusion of the trial, the Babinecs moved for a mistrial. The motion, however, was denied by the court. After deliberating for an hour and one-half, the jury returned a verdict in favor of the Babinecs in the amount of $110,000 as just compensation for Parcels No. A–345 and No. A–348. Judgment was entered giving the State a fee simple interest in the property taken and requiring the Babinecs to pay the State $80,750, the difference between the initial estimated compensation deposited by the state with the registry of court ($190,-750) and the amount of the verdict ($110,-000). The Babinecs' oral and written motions for new trial were denied by the superior court.

The Babinecs now appeal from the final judgment of the superior court, claiming as error numerous evidentiary rulings, orders and instructions of the lower court, including the court's denial of their motions for new trial.

More precisely, they claim that the superior court erred by denying their objections to and motions to strike the value conclusions of the State's expert witnesses as lacking proper foundational support and as being based upon invalid legal assumptions; by issuing its instruction to the jury on the subject of special and general benefits and further, denying their objections to and motions to strike the State's expert witnesses' conclusions regarding the "special benefits" conferred upon the remaining, noncondemned property by the highway realignment project; by prohibiting them from further examining one of their expert witnesses either on redirect or reopened direct examination, while allowing the State on another occasion to continue to examine one of its expert witnesses upon redirect examination; and by excluding their evidence of the State's prior purchases of property, pretrial offers to purchase, and estimates of just compensation deposited with the registry of court. After thoroughly examining the record and carefully considering the parties' briefs, we

finally awarded is less than the amount of money deposited, the court shall enter judgment in favor of the plaintiff and against the proper parties for the amount of the excess.

5. Civ.R. 72(j) provides:
   *Deposit and Its Distribution.* The plaintiff shall deposit with the court any money required by law as a condition to the exercise of the power of eminent domain, and although not so required, may make such deposit. In such case the court and attorneys shall expedite the proceedings for the distribution of the money so deposited and for the ascertainment and payment of just compensation. If the compensation finally awarded to any defendant exceeds the amount which has been paid to him on distribution of the deposit, the court shall enter judgment against the

plaintiff and in favor of that defendant for the deficiency. If the compensation finally awarded to any defendant is less than the amount which has been paid to him, the court shall enter judgment against him and in favor of the plaintiff for the overpayment.

6. Civ.R. 72(h)(2) provides:
   *Hearing Before Master.* A master appointed by the court to ascertain the amount to be paid by the plaintiff to each owner or other person interested in the property shall report to the court pursuant to Rule 53(d)(1). If all parties object to the appointment of a master, they may have a trial by jury or, if the jury is waived by all parties to the action, a trial without a jury, by filing a demand for it within the time allowed for answer or within the additional time which the court may set.

conclude that each of the above-mentioned contentions is without merit.

We find more substantial, however, the Babinecs' claims that the superior court erred in its use of the so-called "unit rule" and in issuing an instruction which prohibited the jury from considering certain valuation evidence offered by expert witnesses who had assigned separate values to individual subunits of property and then added such values together in order to reach their appraisal conclusions. Another substantial issue was raised by the court's allowing the State to introduce into evidence certain exhibits and to present final argument to the effect that the Babinecs possessed "prior knowledge" of the highway realignment and undertook, in bad faith, various property improvements before the condemnation.

From the earliest stages of the proceedings below, the State attempted to have the superior court rule that all of the property owned by the Babinecs constituted one large parcel. The arguments presented were somewhat confusing in failing to distinguish between parcelization problems involving severance damages and issues pertaining to units of valuation not necessarily related to severance damages. Severance damages result from "diminution in value of the remainder area by reason of the severance therefrom of the parcel appropriated. . . . Such damage has been held to be an inescapable sequel to the 'taking' and, therefore, compensable." [7]

■■ Turning first to the question of severance damages, a property owner is entitled to such damages if it is determined that the property taken is part of a larger parcel which has been adversely affected by the taking. The principal test utilized for defining the "larger parcel" for severance damage purposes is often referred to as the "three unities" theory. According to this doctrine, three factors are employed in ascertaining whether property in which the take occurs constitutes a single larger parcel. The factors are: physical contiguity between the several parcels,[8] unity of ownership,[9] and unity of use.[10] Where the various units of property are physically contiguous with others, owned by the same party or parties, and used for the same purpose, the property is said to comprise one single parcel of land.

■ While the "three unities" theory is helpful in ascertaining the "larger parcel" to be considered for severance damage purposes, we do not hold that the theory is controlling. If competent evidence is presented indicating that by reason of condemnation of a portion of his property, remaining property owned by the property owner is diminished in value, the issue of severance damages should be presented to the jury, regardless of whether slavish adherence to the "three unities" theory might lead to a contrary result. In the case at bar the parties had no substantial argument with reference to the entire 65-acre Babinec ownership constituting one "larger parcel" for the purpose of ascertaining severance damages.

Confusion arose, however, by rigidly applying the "three unities" criteria so as to restrict consideration of expert testimony as to evaluation. Despite the fact that the State by its Complaint and Declaration of Taking separately described two takes, Parcel No. A–348 from Tract 1 and Parcel No. A–345 from Block 2, and separately evaluated the amount estimated to be just compensation for each in depositing funds in the registry of the court, it strenuously argued that for evaluation purposes the entire take must be regarded as one parcel.

Quite often use of one larger parcel for evaluation purposes results in a lower value than evaluating smaller component parts and adding their total. For example, in the subject case the Babinecs owned 65

7. 4A Nichols on Eminent Domain § 14.31 [3], at 14–33 (rev. 3d ed. 1971). See numerous cases cited in *id.* n. 38. Severance damages are specifically authorized in Alaska by AS 09.55.330.

8. *Id.* § 14.31 [1], at 14–393.

9. *Id.* § 14.31 [2], at 14–416.

10. *Id.* § 14.31 [1], at 14–394.

acres of which the subdivided portion (Blocks 1 and 2) constituted but 11 acres. The Babinecs' expert witness, Cook, evaluated the subdivided property in Block 2 at $56,733 an acre, whereas he evaluated the 54 acres of Tract 1 at $10,152 an acre. Since the proportion of the property taken in the subdivided section to the total property taken was much higher than the proportion of the entire subdivided acreage to the total acreage, an evaluation based on an average acreage value for the entire property taken results in a substantially lower sum than if the parcels are evaluated separately.

Both of the Babinecs' expert witnesses utilized formulas whereby the two parcels taken were separately evaluated and then added together for the purpose of obtaining a total value for the property taken. The State's experts on the other hand evaluated both tracts taken as one larger parcel.

■ The court quite properly admitted into evidence all of the testimony presented by the experts. This was in accord with our holding in Dash v. State[11] wherein, with reference to an expert testifying as to the value of property for subdivision purposes by discounting proceeds from future sales, we stated:

Finally, for this court to apply the restrictive rules judicially adopted elsewhere to limit expert testimony would invade the traditional province of the jury as trier of fact to weigh the credibility of the expert witness; it would be inappropriate for this court to do so under the guise of a ruling on the admissibility of evidence of properly discovered anticipated proceeds from a proposed subdivision. (Footnote omitted.)

The Babinec trial court, however, ruled at the conclusion of the trial that the jury would be instructed that there was but one take and one parcel involved. The court

then issued Instruction No. 2 to the jury which stated in part:

The evidence discloses that at the time of the take, August 2, 1968, the entire subject property was in one ownership, was contiguous and enjoyed a unity of use. Although Parcels A–345 and A–348 were designated, I have determined that Tract 1, Block 1, and Block 2, of the subject property were all parts of a larger parcel making up the Southridge Subdivision. Hence, there was on August 2, 1968 a single take by the State of Alaska from a larger parcel known as Southridge Subdivision. . . .

This instruction when combined with Instruction No. 5, in effect eliminated the Babinecs' expert witnesses' conclusions from consideration by the jury. Instruction No. 5 stated in part:

An expert appraiser may consider the highest and best uses of the property or portion thereof and take into consideration any factors which enhance the value of the property such as the availability of utilities, subdivision, access and the like.

But it is not proper for an expert appraiser to ascribe individual evaluations to individual *lots or parcels* within the total ownership being evaluated, *and to then add up these separate evaluation figures of the separate lots or parcels, in order to determine his appraisal conclusions*, including benefits, damages or just compensation. (Emphasis added.)

At the very least, the effect of Instruction No. 5 was to foreclose jury consideration of the Babinecs' experts', Cook's and Gebhart's, value conclusions.[12] The references to "parcels", and the prohibition against addition of separate evaluation figures, in effect instructed the jury to discount the testimony of Babinecs' witnesses, who had separately evaluated the two parcels and then added the figures together.

---

11. 491 P.2d 1069, 1076 (Alaska 1971).

12. Counsel for the State conceded in both his appellate brief and oral argument that

the effect of Instruction No. 5 was to prohibit jury consideration of the property owners' expert witnesses' value conclusions.

If there were no adequate evidentiary basis for separately valuing the lots and the two parcels it would be the court's duty to give an instruction such as Instruction No. 5. The problem is analogous to that considered in State v. 7.026 Acres [13] wherein it was contended that evidence should not have been admitted pertaining to the intention of a property owner to subdivide his property into about 55 lots and sell them as recreational cabin sites. In discussing the admission of testimony as to the adaptability of the condemned property to development of a subdivision we stated:

> Such adaptability, merely within the realm of possibility, is not sufficient. It must be shown that the use for which the property is claimed to be adaptable is reasonably probable. If this cannot be shown, evidence of prospective use must be excluded because it would allow mere conjecture and speculation to become a guide for ascertainment of value, and this is not a permissible method for the judicial ascertainment of truth. (Footnotes omitted.)

■ We are here confronted with the question of whether there was sufficient evidence presented as to a difference in character of the subdivided property of Block 1 and Block 2 from the remainder of the Southridge Subdivision to permit the jury's consideration of separate evaluations for the two parcels taken (one parcel, A–345, being within Block 2, a portion subdivided into lots; and the remaining parcel, A–348, being located in Tract 1, not similarly subdivided). We do not believe the facts pertaining to the use of the Babinec property are so unequivocal as to justify a determination by the court rather than the jury. In short, the State essentially argues that Southridge Subdivision was a mere "paper subdivision" and that in reality, the

Babinec ownership was entirely vacant, undeveloped property. The superior court agreed with the State's conclusion, and found " . . . the land in question was in one ownership entirely and enjoyed a unity of use. . . . " We are, however, persuaded that jury issues were presented as to whether the Babinecs had made certain substantial improvements to their property; whether Southridge Subdivision was more than a paper scheme; and whether the entire 65-acre ownership should be regarded as constituting more than one parcel for evaluation purposes. Specifically, a plat of the subdivision was certified on January 26, 1967 and was accepted and filed in the Anchorage Recording District on March 31, 1967. The plat having been accepted and filed could not be revised without a public hearing and permission of the platting authority.[14] One of the subdivided lots was sold in July 1967, but was subsequently repurchased and exchanged for another lot sometime after the taking. Another lot, in the southwest corner of the property, was leased and a service station was later erected thereon. Pursuant to an agreement with the City of Anchorage, the Babinecs dedicated the rights of way adjacent to 36th Avenue and LaTouche Street to the City. Certain storm drains and utility easements were similarly dedicated. Thereafter, the City installed various utilities and two "catch basins" along an east-west easement running entirely across the northern portion of Blocks 1 and 2 (between them and Tract 1). Sewer, storm and water lines were also laid in Southridge Drive, which had been excavated by Babinec but not yet raised to grade level. To our minds, these facts clearly raise a substantial question of fact as to whether Parcel A–345 located in the subdivided section could be separately evaluated from Parcel A–348, located in Tract 1.[15]

13. 466 P.2d 364, 366 (Alaska 1970).

14. AS 40.15.140 through 40.15.180 (repealed by § 1, ch. 118, SLA 1972) set forth the procedure for vacation and change of plats and streets.

15. On the following facts, similar to those applicable to Tract A–345, the court in State v. Boyer, 130 So.2d 738, 743 (La. App.1961) concluded that "the property was properly classified as a subdivision":

> The record discloses that roads and ditches had been cut; the boundaries

The central objective in eminent domain proceedings such as the one before us is the determination of just compensation for the property condemned. Achievement of this goal must not be deterred by rigid evidentiary rules or technical formulas. As the Supreme Court of Hawaii observed in Territory of Hawaii v. Adelmeyer: [16]

. . . [I]n partial taking cases, no rigid rules can be prescribed. The facts and circumstances of each case must be considered to determine the applicable formula. . . .

'The rules for determining value of land taken by condemnation cannot, from the nature of the case, be inflexible. In each case just compensation is the goal; and where rigid application of even a settled rule will produce injustice it must be departed from so far as made necessary by the circumstances of the case. . . .'

(Citation omitted.)

We note with approval that court's interpretation of the jury's responsibility for evaluating condemned property in partial-take cases:

Where, as here, the parcels taken approach such size and character as to assume proportions of independent economic use, in the light of the highest and best use of the land, the rationale of the

rule of valuing "the whole first, then on that basis, assign a value to the part condemned" dissolves into meaninglessness. The method of valuation of the parcels taken, whether as a separate entity or in relationship to the whole tract, then becomes a matter of opinion of the appraisers to be weighed by the jury. (Citations omitted.) [17]

While we decline to fashion a rigid evidentiary rule regarding the admission of appraisal testimony or to precisely define the scope and nature of the jury's province in all eminent domain proceedings, we hold that in the case at bar, the superior court erred by issuing Instruction No. 5.

A contrary conclusion is not compelled by the authorities cited by the State. We do not take issue with the State's legal proposition that expert appraisals of a large parcel of land may not be "based upon a simple aggregate of retail sale values of individual lots carved from that parcel." [18] We do, however, disagree with the State's contention insofar as it would prohibit the jury's consideration of evidence regarding retail sales values of parcels or lots where such property is immediately and readily marketable. Expert testimony was presented at the trial to the effect that the six subdivided lots of Blocks 1 and 2 were immediately and readily marketable. In In re Appropriation for Highway Purposes of Lands,[19] a case with a

had been set out; the streets were laid out and staked; that two streets had been dedicated; that estimates as to the cost of bringing in utilities, i. e. water, electricity and gas had been obtained; cost of shell for the streets had been obtained; an engineering firm had been employed and a work order actually given for completion of surveying and measuring out of the lots. The evidence further discloses that when defendants learned that part of the property was going to be expropriated they discontinued their preparations for finishing the subdivision.

16. 45 Haw. 144, 363 P.2d 979, 985 (1961).
17. *Id.* at 986.
18. Appraisals may not be based upon the aggregate of *unadjusted* retail sales values of lots or hypothetical divisions. As Nichols observes:

It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used as a farm or is covered with brush and boulders. The measure of compensation is not, however, the aggregate of the prices of the lots into which the tract could be best divided, since the expense of clearing off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of cannot be ignored, . . . . 4 Nichols on Eminent Domain § 12.3142 [1], at 12–245, 12–248 (rev. 3d ed. 1971). (Footnote omitted.)

19. 15 Ohio App.2d 131, 239 N.E.2d 110, 113–114 (1968).

factual context similar to the one at bar, the court concluded that the jury could properly consider evidence of individual lot values. There the court stated:

In this case the land was not merely suitable for subdivision purposes. The process of subdivision, platting, recording and development had progressed to the point where the individual lots were available as separate units for sale. One lot had been sold. Two others had had homes built or partially built upon them for sale. There were available, as testified to by the appraisers, lots, the sales of which were comparable to these in that there were no sewers and no centralized water system. In short, a valuation of each lot was practical and available.

To insist that the land must be appraised as a whole without reference to individual lot values would, in effect, deprive the owner of a valuation of the highest and best use of the land as individual residence lots and force him to value the land merely as land available for subdivision purposes. Land which is thus divided and presently suitable for sale as individual lots to many buyers would have a higher market value than land which is merely currently suitable for sale as one tract to a single person who would in turn subdivide or develop the land for sale to others. Such a single buyer would have to consider factors of risk which individual lot buyers would not have to recognize.

Therefore, although the question for the jury is the fair market value of the tract as a whole, evidence as to the individual lot values would be both pertinent and necessary to a consideration of the highest and best use of the land.[20]

In the case before us, Blocks 1 and 2 of the Babinec property had been subdivided into six smaller lots. Indication that a market for such lots existed was demonstrated by the sale of one lot prior to the date of taking. Valuation evidence based in part upon the ascription of retail values to individual lots and comparable sales data should properly have been admitted for the jury to consider. Here, however, Instruction No. 5 prevented jury consideration of appraisals in which the expert assigned "individual evaluations to individual lots or parcels . . ." which were added in order to determine conclusions. To the extent that the appraisals were permissibly based in part upon individual lot values, the instruction erroneously excluded admissible evidence. The jury should have been allowed to consider all of the experts' testimony, including their value conclusions.

We do not believe that our decision today leaves the State helpless against a property owners's appraisers who seek artificially to inflate the value of the condemned property through the use of undiscounted retail sales values of subdivided lots, or unreliable comparable sales data. Retail sales values must be properly adjusted,[21] and the State is always safe-

---

20. To the same effect is State, Dept. of Highways v. Cobb, 169 So.2d 419, 421 (La.App.1964), where the court concluded that "the trial judge correctly held that the value of the property expropriated should be on a lot basis rather than on an acreage basis." *See also* Commonwealth, Dept. of Highways v. Caudill, 388 S.W.2d 376, 378 (Ky.1965).

21. In In re Appropriation for Highway Purposes of Lands, 15 Ohio App.2d 131, 239 N.E.2d 110, 114 (1968), the court prescribed one acceptable means of evaluating the parcel on the basis of individual lots:

However, the value of the whole parcel would not be the simple mathematical total of the individual lot values Except in the event of a rare and highly promoted auction sale taking place in a single day, a subdivision is ordinarily sold to a multiplicity of buyers over a period of years. This factor of time must be considered, to arrive at the fair market value on the single day of taking.

How may this be done? One way is exemplified by the present case. Experts render an educated opinion based on comparable sales of similarly sized and improved tracts to individual purchasers to arrive at the aggregate price which the lots would sell for if willingly sold to individual willing purchasers irrespective of the time factor

guarded by the opportunity to discredit such experts during cross-examination.

With reference to the procedure followed by the Babinecs' experts in appraising the two parcels separately, rather than as one larger parcel, we are further persuaded by the facts that the State so designated the property in its complaint and in making its initial deposits with the registry of the court. Having taken the position that there were two parcels being condemned, the State will not be permitted to eliminate conclusions of the property owners' experts based on just such a classification. At the least the State should have sought to amend its complaint before seeking to have adopted a rule of single parcelization. In the event of such an amendment, a continuance might well have been required.

Although we believe that the case was generally well tried by the parties and fairly conducted by the trial court, for the reasons mentioned above we are obliged to reverse the judgment of the superior court and remand the case for a new trial.

■ One other claim of error requires comment since on retrial the issue will doubtlessly be again presented to the trial court. In specific regard to the Babinecs' claim of error concerning the State's references, both at trial and during final argu-ment, to their "prior knowledge" of the highway realignment project and their alleged precondemnation "bad faith" property improvements, we find that the superior court's instruction on the "prior knowledge" issue, Instruction No. 8 was a correct statement of the law.[22] Property owners who are aware of proposed condemnation nevertheless may make reasonable improvements to their property and are entitled to the value of the improvements made with such knowledge before the taking. The evidence of prior knowledge is ordinarily irrelevant and inadmissible. See Ketchikan Cold Storage Co. v. State, 491 P.2d 143, 153 (Alaska 1971).

■ On the other hand, the property owner is not entitled to the value of improvements made solely in bad faith for the purpose of enhancing an award.[23]

Upon retrial, evidence of "prior knowledge" should not be admitted unless its relevance is established for some purpose other than to show that the property owner made reasonable improvements to the property after acquiring knowledge of the proposed condemnation.[24]

The judgment is reversed and the case remanded for a new trial.

ERWIN and FITZGERALD, JJ., not participating.

---

—i. e., what all lots would sell for to individual purchasers. Then a discount factor based upon the expert's opinion as to the anticipated period it would take to effect such individual sales would be applied, which would on the average correct for the difference between present and deferred receipt of purchase price and for costs of sale not expended.

22. Instruction No. 8 stated:
   Knowledge of the fact by the property owner that a public improvement, such as a highway, is proposed which will result in taking from his land does not deprive the owner from recovering for the full market value of the property taken and for damages, if any, to the remainder resulting from the take. This is so even though if after learning of the proposed improvement, the property owner reasonably undertakes to improve his land resulting in enhancement of its value. Even though preliminary announcement has been made by public authority, the making of the contemplated highway improvement may not take place and it would be unjust to deprive the property owner of the right to make in good faith the best use of his property.

23. 4 Nichols on Eminent Domain § 13.14, at 13–16 (Rev.3d ed. 1971).

24. Plats of the property owner which depicted the proposed right of way by means of dotted lines, and which were prepared prior to the taking, were introduced into evidence by the State. On retrial, if such plats are introduced copies should be obtained with the proposed highway lines eliminated, unless relevancy of the property owner's prior knowledge is established for a proper purpose.