MAASSEN, Justice.
*957 I. INTRODUCTION
A public utility filed a condemnation action seeking the land use rights necessary to construct a natural gas storage facility in an underground formation of porous rock. The utility held some rights already by assignment from an oil and gas lessee. The superior court held that because of the oil and gas lease, the utility owned the rights to whatever producible gas remained in the underground formation and did not have to compensate the landowner for its use of the gas to help pressurize the storage facility.
The court held a bench trial to determine the value of the storage space. The landowner appeals the resulting compensation award. It argues that it retained ownership of the producible gas in place because the oil and gas lease authorized only production, not storage. It also argues that it had the right to compensation for gas that was discovered after the date of taking. But we conclude that the superior court did not err in ruling that the landowner's only rights in the gas were reversionary rights that were unaffected by the utility's non-consumptive use of the gas during the pendency of the lease.
The landowner also challenges several findings related to the court's valuation of the storage rights: that the proper basis of valuation was the storage facility's maximum physical capacity rather than the capacity allowed by its permits; that the valuation should not have included buffer area at the same rate as area used for storage; and that an expert's valuation methodology, which the superior court accepted, was flawed. We conclude that the superior court did not clearly err, and we therefore affirm its judgment.
II. FACTS AND PROCEEDINGS
A. Facts
Cook Inlet Natural Gas Storage Alaska, LLC ("CINGSA"), is a private company building a natural gas storage facility on the Kenai Peninsula.[1] The facility stores natural gas collected from other sites by injecting it into a mostly depleted rock formation nearly a mile underground - the Sterling C Reservoir - so that it can be withdrawn in wintertime when the demand for natural gas exceeds what local production can immediately supply.
To ensure the efficient extraction of gas, the facility must maintain a minimum amount of pressurization, which in turn requires that it retain a minimum amount of gas in storage. This is called "base gas" (or "cushion gas"). In the Sterling C Reservoir, part of the need for base gas was satisfied by gas left in the reservoir at the time CINGSA acquired it; such gas left in the ground is known as "native gas." Any gas in the reservoir in addition to the base gas is called "working gas," since that gas moves in and out of storage according to demand.
The storage facility's "safety, pressure limitations, and other operational matters" were subject to regulation by the Alaska Oil and Gas Conservation Commission (AOGCC), and its "financial and economic matters and relationships with its customers" were regulated by the Regulatory Commission of Alaska (RCA). The RCA granted CINGSA a certificate of public convenience and necessity in 2011, and CINGSA, as a regulated public utility, proceeded to use the power of eminent domain to acquire the property rights necessary for the storage facility's operation.[2]
Kenai Landing, Inc. owns a parcel of land overlying the Sterling C Reservoir. Kenai Landing acquired the property subject to an existing oil and gas lease - the "Wards Cove Lease" - entered into in 1978 by C.W.C. Fisheries and Union Oil Company. The *958 Wards Cove Lease, committed to the Cannery Loop Unit,[3] provides that it will not terminate as long as gas is being produced anywhere in the unit. When CINGSA filed its condemnation action, the royalty rights under the Wards Cove Lease were held by Wards Cove and the production rights were held by Marathon Alaska Production Company. CINGSA negotiated separate agreements with both Wards Cove and Marathon, acquiring their rights as lessor and lessee, respectively, under the lease. The Department of Natural Resources (DNR) then agreed to sever the Sterling C Reservoir from the Cannery Loop Unit so that it could be used for storage purposes.
Sometime after CINGSA commenced its condemnation action, it discovered "a pocket of gas" referred to as the "isolated reservoir." CINGSA's drilling brought this "new gas" into contact with the gas already known to be in the reservoir; the new gas, thus, increased the volume of native gas overall, including that underlying Kenai Landing's property.
B. Proceedings
In March 2011 CINGSA filed a complaint against Kenai Landing and others to condemn the rights to the Sterling C Reservoir that it had not been able to acquire through negotiation. It sought to condemn (1) an easement for gas storage, to include the underground formations in the Sterling C Reservoir plus an adjoining geological zone for use as a "buffer"; and (2) an easement in the mineral interests, which would allow CINGSA the use of "all gas, oil, or other minerals ... located within the Sterling C Pool and the correlative buffer geological formation," including the use of native gas as "base gas for the storage facility."
CINGSA moved for partial summary judgment, asking for a ruling that Kenai Landing had no right to compensation for any of the native gas in the Sterling C Reservoir because CINGSA owned this gas as assignee of the Wards Cove Lease. Kenai Landing countered that the lease had been terminated, either by the condemnation itself or by DNR's severance of the Sterling C Reservoir from the Cannery Loop Unit, and that ownership of the minerals had therefore reverted to Kenai Landing. The superior court decided that the Wards Cove Lease was still in effect and granted summary judgment on this issue in CINGSA's favor.
The parties agreed that Kenai Landing had a right to compensation for the use of its property for underground gas storage.[4] A hearing to value these storage rights was held in June 2013 before a master, who determined that Kenai Landing was entitled to $ 125,000 in compensation. Kenai Landing requested a trial de novo, and the superior court held a bench trial over seven days in May 2016. Each side presented expert testimony by appraisers and petroleum engineers. Finding CINGSA's expert testimony more credible, and declining to defer to the master's determination of value, the superior court concluded that Kenai Landing was entitled to $ 65,000 for the gas storage rights. Adding $ 23,677 for the stipulated value of the non-producible minerals under Kenai Landing's land,[5] the total compensation award to Kenai Landing was $ 88,677. Kenai Landing now appeals.
III. STANDARD OF REVIEW
We review a decision on summary judgment de novo.[6] "We will affirm a grant of *959 summary judgment if there are no genuine issues of material fact and if the movant is entitled to judgment as a matter of law."[7] Whether the superior court applied the correct legal standard in an eminent domain proceeding is a question of law which we also review de novo.[8]
The proper amount of compensation to be paid for a taking is a factual question.[9] "We review the factual findings of a trial court for clear error, 'a standard that is met if, after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made.' "[10]
IV. DISCUSSION
Kenai Landing raises five issues on appeal. First, it argues that the superior court erred by failing to compensate it for CINGSA's use of the native gas remaining in the Sterling C Reservoir as base gas. Second, it argues that it was also entitled to compensation for its proportionate share of the new gas CINGSA discovered after the taking.
Kenai Landing's other three claims relate to the superior court's valuation of the gas storage space. It argues that the court erred by failing to consider the "highest and best use" of the land and the "fullest extent" rule; that the court erred by giving equal value to the storage space and the surrounding buffer zone; and, finally, that the court erred by relying on the valuation testimony of one of CINGSA's expert witnesses, who Kenai Landing contends applied the valuation methodology improperly.
We conclude that none of these issues involves legal error or a clearly erroneous finding of fact, and we therefore affirm the superior court's judgment.
A. The Superior Court Did Not Err In Deciding That Kenai Landing Was Not Entitled To Compensation For CINGSA's Easement In The Native Gas.
Kenai Landing argues that the superior court erred when it concluded that Kenai Landing owned at most "a reversionary interest in the native gas in place." Kenai Landing argues that the only interest in native gas that its predecessor-in-interest transferred to Marathon under the Wards Cove Lease was the right to extract it. Kenai Landing argues that the rights transferred under the lease "relate exclusively to production and do not include the right to make use of the native gas as Base Gas," a right which "is instead part of the rights the lessor retained and belong to the property's fee simple owner, [Kenai Landing]." Kenai Landing argues that its perspective is supported by the language of the lease, "which the superior court utterly failed to analyze."
We do not find the lease language to be as "straightforward" as Kenai Landing characterizes it. The granting clause is broad: "[The] lessor ... has ... leased ... exclusively unto the lessee the hereinafter described land ... for the purpose of the drilling, mining, and operating for, producing, and saving all of the oil [and] gas ...." A later paragraph provides that "[t]he lessee shall have the right to use, free of cost, gas ... found on said land for its operations thereon ...." The lease specifically contemplates that it will remain in effect even if not producing, as long as it is part of a unit on which some production is occurring and the lessor is being paid royalties on the unit's production.
Citing cases, Kenai Landing argues that "it would be unusual to interpret a production lease like the Wards Cove Lease to include the right to store non-native gas absent specific language conferring that right upon the lessee."[11] That may be true, but *960 "the right to store non-native gas" is a separate issue; Kenai Landing is being compensated for CINGSA's storage of gas in Kenai Landing's pore space, though it disputes the amount. What concerns us here is the use of the native gas, not the storage of non-native gas. Kenai Landing concedes that both Marathon and CINGSA, as the assignee of Marathon's production rights, had the right to produce all the native gas if they chose to do so.[12] The lease contains no clear stipulations as to ownership and use rights if the native gas is not produced but is kept in the ground instead.
Relying on general principles of oil and gas law (applied by some but not all jurisdictions), CINGSA contends that when it "acquired the native gas under [Kenai Landing's] property by virtue of acquiring the Wards Cove Lease, it acquired ownership of this gas for any and all purposes."[13] Kenai Landing argues, on the other hand, that "[a]bsent specific language in the lease conveying the minerals in place to the lessee, the lessor retains title to same, so long as they remain under the land."[14] Whether a landowner owns the minerals in place under its land - or only the right to own the minerals once they are brought to the surface and "captured" - is a longstanding question of natural resource law that we do not need to answer here.[15] Our decision is governed instead by the principles we use to determine "just compensation" in condemnation cases.
"In Alaska, the fundamental goal of 'just compensation' is to make the property owner whole."[16] "[T]he property owner should be placed as fully as possible in the same position as he [or she] was in prior to the taking of his [or her] property."[17] These principles determine the measure of "just compensation": "[J]ust compensation is determined by what the owner has lost and not by what the condemnor has gained."[18] The court's task, therefore, is to determine what the condemnee has lost by virtue of the condemnation.[19] Here, assuming for discussion purposes that Kenai Landing has title to the native gas in place subject to the Wards Cove Lease, what has Kenai Landing lost by virtue of CINGSA's condemnation of an easement in that gas for the duration of the lease?
We must conclude that the answer is "nothing." The Wards Cove Lease gave the lessee production rights - which CINGSA had by assignment - and gave the lessor a royalty interest - which CINGSA also had by assignment. As the superior court explained, "[Kenai Landing] does not have the current right to produce or receive royalties on any portion of the native gas in place ... as long as its ownership is subject to the Wards Cove Lease because the production *961 rights belong to the lessee ...." And "[Kenai Landing] had no ability to stop gas production in the Sterling [C], which could have continued until economically depleted." Marathon could have extracted the native gas and sold it as its own, and CINGSA, as Marathon's assignee, had the same right, as Kenai Landing recognizes. It is only if the Cannery Loop Unit as a whole ceases production that there will occur "the collateral effect of terminating the Wards Cove Lease, and the full [Kenai Landing] fee interests will thereupon be held by [Kenai Landing], including its reversionary interests in the oil and gas aspects of the mineral estate."
Until that time, and however Kenai Landing's current interest is characterized, its right to the gas may fairly be called reversionary: it has no current right to extract native gas, to block its production, or to use the native gas in place for any purpose.[20] CINGSA's non-consumptive use of the gas in place for the duration of the Wards Cove Lease does no damage to Kenai Landing's property rights, which remain undiminished.
Notably, Kenai Landing focuses its argument on appeal not on what it lost by the condemnation but rather on what CINGSA gained: the use of the native gas as base gas. Kenai Landing writes, "Using native gas as Base Gas saved CINGSA the cost of acquiring, transporting and injecting gas into the Sterling C Pool for this purpose from another source." Kenai Landing argues that "there is nothing novel or untoward about requiring payment of compensation for such use." But "just compensation" is payment for what the condemnee lost.[21] CINGSA, by condemning the easement, gained the use of the native gas as base gas, but Kenai Landing did not lose anything it already had. There is no evidence that the fair market value of its reversionary rights was affected in any way by CINGSA's use of the gas for a non-consumptive purpose.[22] We therefore affirm the superior court's holding on summary judgment that Kenai Landing was owed no compensation for the producible native gas remaining in the Sterling C Reservoir at the time of the taking.
B. The Superior Court Did Not Err By Deciding That Kenai Landing Was Not Entitled To Compensation For The Newly Discovered Gas.
Kenai Landing's second claim involves what is termed the "isolated reservoir" of native gas, discovered after the date of taking.[23] As the superior court described it, the isolated reservoir is "a geologic strata/formation" which is "not directly underneath [Kenai Landing's] property" but which, as "the direct result of CINGSA's work on the larger gas storage project," came into "pressure communication" with Kenai Landing's pore space, meaning that the newly discovered gas can circulate through the entire reservoir, including the strata underlying Kenai Landing's property. Kenai Landing argues first that the superior court's ruling - denying compensation for the newly discovered gas for the same reasons it denied compensation for the native gas already known to be in place - was erroneous because "use of native gas as Base Gas is not related to production and thus not something the Wards Cove Lease granted to the lessee; it is instead a right retained by [Kenai Landing] as fee simple owner ...." Like the superior court, we conclude that our decision of Kenai Landing's claim for compensation for the native gas in place disposes of Kenai Landing's claim regarding the new gas as well.
*962 Kenai Landing separately argues against the superior court's reliance on the "scope of the project" rule, which holds that enhancements to the condemned property's value, arising after "it becomes likely that the property will be condemned," do not benefit the condemnee.[24] Generally, a landowner is only entitled to the value of the land as it exists on the date of the taking.[25] Kenai Landing relies on an exception to this general rule: A landowner should be compensated for features of the property (such as minerals) that were unknown on the date of taking but discovered before valuation proceedings.[26]
But the exception is inapplicable here. Gas from the isolated reservoir was not just undiscovered as of the date of the taking, it was not present under Kenai Landing's property at all. The superior court found, and Kenai Landing does not dispute, that the gas came into pressure communication with the gas underlying Kenai Landing's property only after CINGSA accidentally tapped into the isolated reservoir while working on the project. Even if Kenai Landing were otherwise entitled to compensation for CINGSA's use of the native gas as base gas, the scope of the project rule would preclude recovery based on the additional gas released from the isolated reservoir, as it was not a part of Kenai Landing's property when condemnation proceedings began.
C. The Superior Court Did Not Clearly Err In Finding That The "Highest And Best Use" Of The Property Was An 11 Bcf Facility And Properly Refused To Apply The "Fullest Extent" Rule.
Kenai Landing's remaining arguments concern the value of the pore space rights, the subject of the seven-day bench trial. Kenai Landing first argues that the superior court undervalued these rights by failing to consider the "highest and best use" of the pore space.
Kenai Landing's expert appraisal witness, Kenneth Gain, "based his analysis on the assumption that the CINGSA facility would operate at a working gas capacity of 19.54 Bcf, and would cycle 100% of the stored gas each year for 60 years." But the court credited the testimony of CINGSA's expert, Richard Gentges, that there were "technical problems, engineering problems, and market demand problems" that would have to be overcome before such a working gas capacity could be realized. It found Gain's value analysis - "based on assumed revenues on a hypothetical gas storage facility" - to be unreliable and "not grounded in fact," finding instead that the reservoir's capacity was 11 Bcf - the limit set by CINGSA's "current regulatory approvals."
Kenai Landing argues that this finding of fact leads to an unfair result, because the reservoir could conceivably hold 19.54 Bcf, and CINGSA, regardless of its current *963 intentions and regulatory approvals, "now has the right to make use of the pore space's maximum capacity. That is what it obtained, and that is what it should pay for." Kenai Landing relies on the "fullest extent rule," which presumes that "the appropriator will exercise [the rights acquired] and use and enjoy the property taken to the full extent."[27] Kenai Landing faults the superior court for ruling that the fullest extent rule applies only when determining the effect of a taking on the property retained by the landowner following condemnation, a circumstance not present here.[28]
We need not address that argument, because the superior court reached an alternative holding as well: "Even if the fullest extent rule were not limited to the realm of severance damages," applying it in this case would conflict with Alaska law on just compensation. The court explained that while Kenai Landing "seeks to value its storage rights based on the maximum possible working gas capacity CINGSA could theoretically create, assuming extensive expensive investments in infrastructure," the correct standard was "what price a market buyer would have paid for the pore space as it existed on the date of taking."
In Martens v. State we examined how a change in zoning laws, and consequently a possible change in the property's "highest and best use," might affect its value.[29] We recognized that when there is "a 'reasonable probability' of a change 'in the near future' in the zoning ordinance or other restriction, then the effect of such probability upon the minds of purchasers generally may be taken into consideration in fixing present market value."[30] If it was "reasonably probable" that zoning laws would change to allow a more valuable use of the property, a finder of fact could consider the change when determining just compensation.[31]
Regulatory approvals limited CINGSA's use of the Sterling C Reservoir to the storage of 11 Bcf of gas. Assuming that the reservoir could hold 19.54 Bcf of gas, CINGSA, like the builders in Martens , could not use the property in that way without first getting permission of the regulators. The superior court recited testimony by Gentges, CINGSA's expert witness - whom the court specifically found to be credible[32] - minimizing the likelihood that CINGSA would ever have reason to seek that regulatory approval:
For [a capacity of 19.54 Bcf] to be realized, an operator would have to overcome technical problems, engineering problems, and market demand problems. Gentges testified about those problems, which include the fact that the feasibility of expansion had not yet been studied by or for CINGSA; the need to invest in infrastructure to increase both storage and deliverability; well-pad limitations; and the complexity of drilling in an area already riddled with existing wells.
....
Gentges testified that he was unaware of any evidence of demand for a working gas capacity beyond 11 Bcf, and that an expansion to that level may not be physically or technologically possible or feasible. The actual storage activity under the comparable leases after the date of taking gave no evidence of unmet demand.
The evidence recited by the superior court supported its finding that a change in the *964 approved storage capacity was not reasonably probable in the near future, as required in Martens for that change to affect value. Kenai Landing cites no evidence to the contrary; indeed, its expert witnesses at trial simply assumed the possibility of expanded use and did not explore its likelihood.
Because the superior court did not clearly err when it found that a change in the property's current storage capacity was not reasonably probable in the near future, it properly declined to apply the fullest extent rule as urged by Kenai Landing.
D. The Superior Court Did Not Clearly Err By Including The Buffer Area When Valuing The Condemned Property.
Kenai Landing also argues that the superior court erred when it calculated Kenai Landing's percentage of the condemned area - and thus its percentage of the area's value - based not only on the area of the Sterling C Reservoir itself but also including 722 acres of buffer zone. Kenai Landing argues that by "assign[ing] equal value to land not used to store gas (i.e., the Buffer Zone) as though it were so used," the court's analysis "dilutes the value assigned to the actual pore space" and "punishes [Kenai Landing] based on CINGSA's arbitrary determination as to how much non-pore buffer area to include within its proposed 'storage boundary.' "
The court included the buffer zone for valuation purposes based on the testimony of CINGSA's expert witnesses, whom the court specifically found credible on this issue as on others. The court cited expert testimony that the only commercial value of Kenai Landing's pore space was for gas storage, and "in reality, it had no use until someone put all of the necessary elements for a gas storage project together." Those necessary elements included a buffer zone. Three of CINGSA's experts testified consistently that a buffer zone is "required for prudent operation" of a gas storage field, that it is "important to the integrity of a gas field," and that "in the industry no difference is made in the leasing rates applicable to surface land over the reservoir area versus land located over the buffer area." As the superior court recognized, the fact-finder in eminent domain proceedings has flexibility in determining the appropriate valuation method under the circumstances.[33] We cannot say that the court acted unreasonably in relying in large part on industry practice as described by witnesses it deemed credible.[34]
Kenai Landing contends that industry practice cannot "dictate a rule that assigns the same value to [a] non-productive buffer zone as to the land that creates the value - the productive pore space." In support of this proposition, Kenai Landing cites one case, Consumers Power Co. v. Allegan State Bank ,[35] in which it contends "the acquiring entity offered landowners much more (in excess of two and a half times as much) to acquire rights 'in the productive zone' than in the 'buffer' zone." But Consumers Power did not purport to apply a rule requiring different values for "productive" and "buffer" zones; the relevant portion of the decision only describes what the utility company offered. And even that does not support Kenai Landing's position. The condemning authority valued storage rights equally in the buffer land and the storage land; the difference in values depended on whether the land also included minerals that were being acquired at the same time.[36]
*965 We see no clear error in the superior court's finding that, consistent with industry practice, its valuation should include the buffer area at the same rate as the land including the useable pore space.[37]
E. The Superior Court Did Not Commit Clear Error When It Chose To Credit An Expert's Valuation Methods.
Kenai Landing's final argument is that one of CINGSA's valuation experts, Louis Petho, did not properly carry out the "income" approach to valuation he claimed to be using. Petho looked at comparable leased properties, determined the revenue they generated for the lessors, and divided the revenue by the number of leased acres to determine an annual per-acre lease rate, which he then applied to Kenai Landing's property to reach a total value of $ 47,500. Kenai Landing faults this method because "[t]he leased properties in question[ ] were not leased on an annual-per-acre lease rate; they generally included only a very nominal per acre payment, and generated the bulk of their revenues from storage and injection fees paid." Kenai Landing argues that these revenue histories "tell us nothing about the probable revenue the Sterling C Pool, and [Kenai Landing's] interest in same, can generate from gas storage."
The superior court found Petho's testimony "credible and reliable" and that he was "the most experienced in the valuation of gas storage rights" of the three expert appraisers who testified at trial. But the superior court did not rely entirely on Petho's testimony. CINGSA called a second appraiser, Bernie Shaner, who identified what he considered to be problems with Kenai Landing's estimate of value. Shaner "approved Petho's methodology, testifying that it is the one he uses and has seen used throughout his career, [but] he did not approve Petho's analysis wholesale." Rather, Shaner "conducted his own appraisal of [Kenai Landing's] interests, using all the comparable data relied on by both of the other appraisers" - Petho and Kenai Landing's expert, Gain. After making some adjustments to Petho's numbers, Shaner came up with "a total value of $ 64,754 for [Kenai Landing's] three parcels, which he rounded up to $ 65,000."
The superior court observed that "Petho, Gentges, and Shaner all testified that Petho's method is the one actually used by the market throughout the natural gas storage industry," whereas the method proposed by Gain - a "discounted cash flow analysis" that assumed certain hypothetical injection and withdrawal rates for CINGSA's stored gas - "is a novel approach that is not in use in the storage industry." The court found "that Petho's method is the appropriate method to value the subject property and further accept[ed] Shaner's review adjustment of his opinion to find $ 65,000 as just compensation for the gas storage easement ...."
Again, we note the fact-finder's flexibility in determining the appropriate valuation methodology under the circumstances of the case,[38] the relevance of industry custom,[39] and the deference we give to the superior court's credibility determinations.[40] We conclude that the superior court did not clearly err when it relied in part on Petho's methodology in crafting its valuation.
*966 V. CONCLUSION
We AFFIRM the judgment of the superior court.

We recently described CINGSA's storage of natural gas in underground porous rock formations in City of Kenai v. Cook Inlet Natural Gas Storage Alaska, LLC , 373 P.3d 473, 475 (Alaska 2016).

See AS 42.05.631.

Unitization allows the joint operation of a producing reservoir by different interest holders. See White v. State, Dep't of Nat. Res. , 984 P.2d 1122, 1125 n.5 (Alaska 1999) ("A 'unit agreement' is '[a]n agreement or plan of development and operation for the recovery of oil and gas made subject thereto as a single consolidated unit without regard to separate ownerships and for the allocation of costs and benefits on a basis as defined in the agreement or plan.' " (quoting Howard R. Williams & Charles V. Meyers, 8 Oil and Gas Law 1315 (1992))).

The parties also stipulated that CINGSA's storage easement did not include any rights to use the surface of Kenai Landing's property.

The "non-producible minerals" are those that will remain in the subsurface after the lease expires, including some gas that will never be removed from the Sterling C Reservoir because it is not technologically or economically feasible to produce it. CINGSA compensated Kenai Landing for these minerals by stipulation on the theory that it is "industry custom" to compensate the landowner for the nominal value of the easement over the non-producible minerals.

Alakayak v. B.C. Packers, Ltd. , 48 P.3d 432, 447 (Alaska 2002).

Id.

State v. Alaska Laser Wash, Inc. , 382 P.3d 1143, 1150 (Alaska 2016).

See Triangle, Inc. v. State , 632 P.2d 965, 968 (Alaska 1981) ("It is only when a trial court concludes that the landowner has presented a valid claim that the case is submitted to the jury for a determination of the extent of the taking and the amount of compensation that must be paid.")

Beeson v. City of Palmer , 370 P.3d 1084, 1088 (Alaska 2016) (quoting Rausch v. Devine , 80 P.3d 733, 737 (Alaska 2003) ).

See Mason v. Range Res.-Appalachia LLC , 120 F. Supp. 3d 425, 440 (W.D. Pa. 2015) ("[The] granting clause [of a typical oil and gas lease] generally conveys to the lessee the right to use the property to drill for and produce oil and gas, and in the case of a 'dual purpose' lease also conveys the right to use the property for the storage of gas."); Ellis v. Ark. La. Gas Co. , 450 F. Supp. 412, 420-21 (E.D. Okla. 1978) (concluding that, in absence of express language, production lease does not convey "injection, storage or occupation rights").

Kenai Landing concedes that "[w]ere CINGSA at some future date to abandon its storage operation, and then seek to produce the remaining native gas, it would have that right ...."

See Comm'r v. P.G. Lake, Inc. , 356 U.S. 260, 261 n.1, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) ("An oil and gas lease ordinarily conveys the entire mineral interest less any royalty interest retained by the lessor."); Nat. Gas Pipeline Co. of Am. v. Pool , 124 S.W.3d 188, 192 (Tex. 2003) ("When an oil and gas lease reserves only a royalty interest, the lessee acquires title to all of the oil and gas in place, and the lessor owns only a possibility of reverter and has the right to receive royalties.").

See Miller v. Ridgley , 2 Ill.2d 223, 117 N.E.2d 759, 761 (1954); Rist v. Toole Cty. , 117 Mont. 426, 159 P.2d 340, 343 (1945).

The majority rule is that the landowner owns the minerals in place (in the ground). See, e.g. , McDonald v. Unirex, Inc. , 221 Mont. 156, 718 P.2d 316, 317 (1986) ; U.S. Steel Corp. v. Hoge , 503 Pa. 140, 468 A.2d 1380, 1383 (1983) ; Stephens Cty. v. Mid-Kan. Oil & Gas Co. , 113 Tex. 160, 254 S.W. 290, 292 (1923). A minority holds that minerals in place are not capable of ownership; they are not owned until extracted, i.e., "captured." See, e.g. , Halbert v. Hendrix , 121 Ind.App. 43, 95 N.E.2d 221, 223 (1950) ; Sunray Oil Co. v. Cortez Oil Co. , 188 Okla. 690, 112 P.2d 792, 793 (1941).

City of Kenai v. Burnett , 860 P.2d 1233, 1242 (Alaska 1993).

Ketchikan Cold Storage Co. v. State , 491 P.2d 143, 150 (Alaska 1971).

Gackstetter v. State , 618 P.2d 564, 566 (Alaska 1980) ; see also State v. Teller Native Corp. , 904 P.2d 847, 849 (Alaska 1995).

Teller Native Corp. , 904 P.2d at 849.

See Collins v. Chappell , 333 P.2d 578, 583 (Okla. 1958) (lessor with a reversionary interest "can only hope that the present lease will terminate before the minerals in the land are exhausted" (quoting 3A Summers, Oil and Gas 311 (Perm. ed. 1954))).

Teller Native Corp. , 904 P.2d at 849.

See City of Kenai v. Burnett , 860 P.2d 1233, 1241 (Alaska 1993) (explaining that proper measure of damages for taking of easement is difference in property's fair market value before and after taking).

The parties stipulated to March 11, 2011, as the date of taking. The superior court referred to the interior reservoir as a "post-taking discovery" and quoted the RCA as stating that "CINGSA was not aware of the existence of the 14.5 Bcf [billion cubic feet] when it acquired the reservoir." The relevant facts thus appear to be undisputed.

See City of Valdez v. 18.99 Acres , 686 P.2d 682, 689 (Alaska 1984) (" 'If the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the owner is not entitled to any increment in value occasioned by the Government's undertaking the project.' ... The rule thus prevents property owners from receiving many unjustified windfalls, as when, for example, formal condemnation of property which everyone knows will be taken is delayed." (quoting United States v. 320.0 Acres of Land , 605 F.2d 762, 781-82 (5th Cir. 1979) )).

AS 09.55.330 ("For the purpose of assessing compensation and damages, the right to them accrues at the date of issuance of the summons, and its actual value at that date is the measure of compensation of the property to be actually taken ...."); State v. Hammer , 550 P.2d 820, 828 (Alaska 1976) ("The measure of value of property taken is the fair market value as of the date of taking, not the value of the property to the state at any time, nor the value at a time after condemnation." (footnotes omitted)).

See, e.g. , City of Little Rock v. Moreland , 231 Ark. 996, 334 S.W.2d 229, 230 (1960) ("It would be a harsh rule to say that the State ... could take private property containing a deposit of diamonds and pay therefor the price of land having very little value because at the very moment of the taking it was not known that the diamonds were there."); see generally 4 Julius L. Sackman, Nichols on Eminent Domain § 12A.07[2] (3d ed. 2018) ("[I]f appropriated land contains a valuable deposit, which is unknown at the time of the taking, but discovered prior to the time when just compensation is determined, the owner (to be indemnified for the thing taken), must have the value of the deposit included in a reckoning of his or her award.").

Coos Bay Logging Co. v. Barclay , 159 Or. 272, 79 P.2d 672, 677 (1938).

See Sackman , supra note 26, § 14A.02[3] ("In considering the effect of the taking on the remainder, the after value must take into account the proposed use of the project and the effect of that use on the remainder. The landowner is entitled to assume ... that the taking authority will make the full use 'physically possible of any easement or land described in the taking certificate.' " (internal citation omitted) (quoting 2,953.15 Acres of Land v. United States , 350 F.2d 356, 360 (5th Cir. 1965) )).

554 P.2d 407, 409 (Alaska 1976).

Id. (quoting Long Beach City High Sch. Dist. v. Stewart , 30 Cal.2d 763, 185 P.2d 585, 588 (1947) (en banc)).

Id.

We grant "[p]articular deference ... to the superior court's credibility determinations." Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co. , 299 P.3d 148, 166 (Alaska 2012) ; see also AAA Valley Gravel, Inc. v. Totaro , 325 P.3d 529, 531 (Alaska 2014) ("[T]he trial court makes the credibility findings and weighs the evidence, not this court ....").

See Babinec v. State , 512 P.2d 563, 570 (Alaska 1973) ("[I]n partial taking cases, no rigid rules can be prescribed. The facts and circumstances of each case must be considered to determine the applicable formula." (quoting with approval Territory of Hawaii v. Adelmeyer , 45 Haw. 144, 363 P.2d 979, 985 (1961) )).

See United States v. Silver Queen Mining Co. , 285 F.2d 506, 510 (10th Cir. 1960) ("Some speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas or otherwise, and if the quality of proof of value follows the custom of the industry, is the best available, and is sufficient to allow the jury or court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden.").

20 Mich.App. 720, 174 N.W.2d 578 (1969).

Id. at 585-86 (excerpting testimony that utility witness calculated $ 200 per acre offered for land in productive area based on $ 7.50 per acre for storage rights and $ 192.50 per acre for producible gas, while $ 25 per acre offer in nonproductive area was likewise based on $ 7.50 for storage rights but only $ 17.50 for any minerals; and that even when value for nonproductive area was negotiated to higher rate of $ 75 per acre, change came from value of minerals rather than storage rights).

The superior court also credited testimony that seismic data made available to CINGSA after the condemnation showed that in fact there was "little usable pore space below [Kenai Landing's] property," and "part or all of [Kenai Landing's] property more likely than not lies outside the zero gas line" demarcating the boundary between productive and buffer areas. Because we affirm the superior court's choice of a valuation method, we need not address the issue of whether Kenai Landing's interest inside the productive zone was in fact negligible, as one of CINGSA's experts characterized it.

See Babinec , 512 P.2d at 570.

See Silver Queen Mining Co. , 285 F.2d at 510.

Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co. , 299 P.3d 148, 166 (Alaska 2012).